[S.F. No. 24124. Aug. 7, 1980.]

CITIZENS AGAINST RENT CONTROL et al.,
Plaintiffs and Respondents, v.
CITY OF BERKELEY et al., Defendants and Appellants.

820

COUNSEL

Michael Lawson, City Attorney, Theodore R. Lakey, Acting City Attorney, and Charles O. Triebel, Jr., for Defendants and Appellants.

Robert M. Myers, David C. Velasquez, William H. Jennings, Stephen Shane Stark, George Agnost, City Attorney (San Francisco), Burk E. Delventhal, Diane L. Hermann and Alice Suet Yee Barkley, Deputy City Attorneys, as Amici Curiae on behalf of Defendants and Appellants.

Dobbs & Nielsen, Vigo G. Nielsen, Jr., John E. Mueller and James R. Parrinello for Plaintiffs and Respondents.

OPINION ·

MOSK, J.—May a municipality constitutionally place a limit on the size of contributions to committees formed to support or oppose ballot measures? We conclude that while the challenged legislation must be examined with great care, such a limit is constitutional because it serves compelling governmental interests without unduly infringing upon First Amendment rights. Although resolution of a conflict between fundamental interests such as these is never easy, in this instance the balance favors allowing government regulation.

At the April 1977 Berkeley municipal election the electorate was asked to vote on a proposed initiative charter amendment to create a rent control board empowered to fix the rates for most rental units in the city. The measure was controversial, and opponents formed an unincorporated association known as Citizens Against Rent Control (CARC).

Berkeley's Election Reform Act of 1974 (Ord. No. 4700-N.S.) regulates its municipal elections. The city attorney and the Berkeley Fair Campaign Practices Commission informed CARC that section 602 of the act, prescribing a $250 maximum on contributions in support of or in opposition to a ballot measure, would be enforced in the forthcoming election.[1] CARC admittedly accepted several contributions in excess of the $250 limit, totalling some $18,600. On March 30, 1977, the Fair

---

[1]Section 602 is authorized by Elections Code section 22808 and provides: "No person shall make, and no campaign treasurer shall solicit or accept, any contribution which will cause the total amount contributed by such person with respect to a single election in support of or in opposition to a measure to exceed two hundred and fifty dollars ($250)."

"Person" is given a broad definition in section 219 to include all types of business entities as well as individuals.

"Contribution" is broadly defined in section 206 to include all types of monetary do-

Campaign Practices Commission ordered CARC to pay that amount to the city's general fund as required by section 604 of the act.[2] CARC responded by filing a complaint for injunctive and declaratory relief against the city and the commission (hereinafter Berkeley), contending that section 602 was in violation of its First Amendment rights and those of other named plaintiffs who desired to make contributions larger than $250.[3] The superior court granted a preliminary injunction against enforcement of sections 602 and 604.

After the election, CARC amended its complaint to allege it had accumulated a campaign debt of approximately $8,000 and it sought to solicit large contributions to satisfy this debt. CARC then moved for summary judgment on the ground that section 602 was invalid on its face. The court granted the motion and rendered a judgment declaring that section 602 violated the First Amendment to the United States Constitution and article I, section 2, of the California Constitution. Berkeley appeals.

I

Our past decisions, and those of the United States Supreme Court, establish a framework for determining whether section 602 prevents effective political advocacy or impermissibly interferes with associational rights. The seminal ruling is *Buckley* v. *Valeo* (1976) 424 U.S. 1 [46 L.Ed.2d 659, 96 S.Ct. 612], which considered the constitutionality of the Federal Election Campaign Act of 1971 (Pub.L. No. 92-225, 86 Stat. 3) and the Federal Election Campaign Act Amendments of 1974 (Pub.L. No. 93-443, 88 Stat. 1263). *Buckley* upheld against First Amendment attack the act's limitation of $1,000 on *contributions* to candidates for federal office, but invalidated restrictions on *expendi-*

---

nations or loans that are directly or indirectly in aid of or in opposition to a ballot measure.

Section 600, limiting candidate contributions to $250, is not here in issue.

[2]Section 604 provides: "If any person is found guilty of violating the terms of this chapter, each campaign treasurer who received part or all of the contribution or contributions which constitute the violation shall pay promptly, from available campaign funds, if any, the amount received from such persons in excess of the amount permitted by this chapter to the City Auditor for deposit in the General Fund of the City."

[3]The other plaintiffs were a real estate broker, the Berkeley Board of Realtors, and three individuals who alleged they were contributors to CARC and owners of real property in Berkeley.

*tures* by or on behalf of candidates. The court held that the contribution and expenditure of money for political expression were the equivalent of pure speech, and hence that statutory limits thereon must be judged by the strict scrutiny reserved for infringement of First Amendment rights. (*Id.* at pp. 15-19, 58-59 [46 L.Ed.2d at pp. 685-688, 710-711].) We adhered to *Buckley* in *Citizens for Jobs & Energy v. Fair Political Practices Com.* (1976) 16 Cal.3d 671 [129 Cal.Rptr. 106, 547 P.2d 1386] (invalidating expenditure limitations on campaigns to pass ballot propositions), and in *Hardie* v. *Eu* (1976) 18 Cal.3d 371 [134 Cal.Rptr. 201, 556 P.2d 301] (invalidating expenditure limitations on campaigns to qualify ballot propositions). We observed in *Hardie* (at p. 378), "On the other hand, as the high court noted in *Buckley,* appropriate limitations on individual *contributions* remain a constitutionally valid means of dealing with undue influence by moneyed interests in the electoral process. (*Buckley, supra,* at pp. 23-38 . . . .)"

While this case was on appeal, the Supreme Court spoke to a related issue in *First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765 [55 L.Ed.2d 707, 98 S.Ct. 1407], overturning a Massachusetts statute insofar as it prohibited corporations from making *any* expenditure or contribution, directly or indirectly, to influence the vote on ballot measures. The court held that the statute infringed upon First Amendment rights (*id.* at pp. 785-786 [55 L.Ed.2d at pp. 723-724]), and looked to whether it served a compelling state interest by the least restrictive means (*id.* at p. 786 [55 L.Ed.2d at p. 724]). The court recognized the importance of the state's asserted justification of "Preserving the integrity of the electoral process, preventing corruption, and 'sustain[ing] the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government'" (*id.* at pp. 788-789 [55 L.Ed.2d at p. 725]), but declined to find the Massachusetts statute served such an interest in the absence of a showing by record evidence or legislative findings that "the relative voice of corporations has been overwhelming or even significant in influencing referenda in Massachusetts, or that there has been any threat to the confidence of the citizenry in government." (Fn. omitted; *id.* at pp. 789-790 [55 L.Ed.2d at p. 726].) The court rejected the view that the possible influence of corporate advertising on the outcome of the vote justified the complete prohibition of such advertising. (*Id.* at pp. 790-792 [55 L.Ed.2d at pp. 726-728]; see generally Comment, *The Constitutionality of Limitations on Corporate Contributions to Ballot Measure Campaigns* (1978) 13 U.S.F. L.Rev. 145 (hereinafter U.S.F. Comment).)

## II

██ Berkeley's first contention is that CARC and the other plaintiffs have failed to show infringement of their First Amendment rights so as to require it to demonstrate that section 602 serves a compelling governmental interest by the least restrictive means. CARC responds that certain affidavits before the trial court furnished adequate evidence both that its ability to engage in effective political advocacy was impaired and the associational rights of its contributors were significantly diminished. Regardless of the weight of that evidence, however, the controlling federal decisions appear to hold that monetary restrictions on election campaigns will be deemed to require strict scrutiny. Thus in *Buckley* the court differentiated contribution from expenditure limitations, stating that the former resulted in "only a marginal restriction" and "little direct restraint" on political communication. (424 U.S. at pp. 20-21 [46 L.Ed.2d at pp. 688-689].) However, despite the finding of marginal effect the court invoked strict scrutiny in considering the constitutionality of the contribution limitations. (*Id.* at pp. 23-38 [46 L.Ed.2d at pp. 690-699].) We likewise give the challenged ordinance stringent review.

## III

The ordinance at issue here affects one of the prominent attributes of the 20th-century California political landscape: the popular initiative and referendum. We reiterated only recently that "'The amendment of the California Constitution in 1911 to provide for the initiative and referendum signifies one of the outstanding achievements of the progressive movement of the early 1900's. Drafted in light of the theory that all power of government ultimately resides in the people, the amendment speaks of the initiative and referendum, not as a right granted the people, but as a power reserved by them. Declaring it "the duty of the courts to jealously guard this right of the people" [citation], the courts have described the initiative and referendum as articulating "one of the most precious rights of our democratic process" [citation]. "[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it." [Citations.]'" (*Fair Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33, 41 [157 Cal. Rptr. 855, 599 P.2d 46].) The United States Supreme Court recognized our commitment to the initiative and referendum when it declared,

"California's entire history demonstrates the repeated use of the referendums to give citizens a voice on questions of public policy. . . . Provisions for referendums demonstrate devotion to democracy,. . ." (*James* v. *Valtierra* (1971) 402 U.S. 137, 141 [28 L.Ed.2d 678, 682, 91 S.Ct. 1331].)

■ There can be no doubt that government regulation designed to preserve the integrity of the initiative and referendum promotes a goal of the highest priority. As will appear, the Berkeley ordinance serves this compelling interest in a manner that does not frustrate another important aim of the electoral process: i.e., that all be given an opportunity to be heard so as to assure the widest dissemination of opinions on important public questions.

### A

While the provision of the 1911 amendment for statewide initiatives and referenda has drawn most of the public and judicial attention over the years, that amendment also declared, "The initiative and referendum powers of the people are hereby further reserved to the electors of each county, city and county, city and town of the State to be exercised under such procedure as may be provided by law."[4] The Legislature has fully implemented these provisions by statutes regulating county, municipal, and district initiative and referendum elections. (Elec. Code, § 3700 et seq.)

The reason for the adoption of the initiative and referendum methods of direct legislation by the people is beyond any doubt: the electorate sought access to and control of a legislative process that it believed could be dominated by special interests. (See Diamond, *California's Political Reform Act: Greater Access to the Initiative Process* (1975) 7 Sw.U.L.Rev. 453, 455-463; U.S.F. Comment, p. 164; Note, *The Cali-*

---

[4]Former California Constitution, article IV, section 1, paragraph 14. Present article II, section 11, similarly declares, "Initiative and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide. This section does not affect a city having a charter."

The former section also contained a reference to charter cities similar to that in the present Constitution. However, we interpreted this language to merely give charter cities, like Berkeley, the authority to increase the powers of referendum and initiative granted by the Constitution, but not to diminish them. (*Hopping* v. *Council of City of Richmond* (1915) 170 Cal. 605, 610-611 [150 P. 977]; accord, *Crestview Cemetery Assn.* v. *Dieden* (1960) 54 Cal.2d 744, 756 [8 Cal.Rptr. 427, 356 P.2d 171]; *Brown* v. *Boyd* (1939) 33 Cal.App.2d 416, 420-422 [91 P.2d 926]; Comment, *The Scope of the Initiative and Referendum in California* (1966) 54 Cal.L.Rev. 1717, 1723, fn. 40.)

■

*fornia Initiative Process: A Suggestion for Reform* (1975) 48 So.Cal. L.Rev. 922, 923-924.) The initiative and referendum gave the electorate an opportunity to exercise the power of direct as distinguished from representative democracy, and it has made frequent use of that power. The ensuing greater popular participation in public affairs has been generally acknowledged as salutary.

It has also been recognized, however, that the initiative and referendum processes can themselves be employed by the special interest groups whose power they were designed to curb. (Diamond, *op. cit. supra*, 7 Sw.U.L.Rev. at pp. 461-463.) Accordingly, the voters used the initiative to regulate those same processes, and to enact other election reforms, by adopting the Political Reform Act of 1974. (Gov. Code, § 81000 et seq.) Later that year, the Legislature enacted sections 22004 and 22808 of the Elections Code, which allow counties and cities to impose limits on contributions to local ballot measure campaigns. As noted above, such restrictions were said to be constitutional in *Hardie v. Eu.*

While admitting that contribution limitations in candidate elections serve a compelling interest of preventing corruption (*Buckley v. Valeo, supra*, 424 U.S. 1), CARC argues that the subsequent decision in *Bellotti* demonstrates that no comparable danger of corruption exists in a ballot measure campaign. As shown below, we conclude that *Bellotti* is distinguishable from the present case and that to allow large contributions to ballot measure campaigns has an equivalent potential to pervert the purpose of the initiative and more generally corrupt the electoral process.

Concededly, initiative and referendum elections do not raise all the same problems as candidate elections, in which large campaign contributions risk creating future "political debts." (*Bellotti*, 435 U.S. at p. 788, fn. 26 [55 L.Ed.2d at p. 725].) However, the initiative and referendum procedure is nonetheless subject to being perverted by large contributions. Indeed, in their effect upon the *election process*, contributions to candidates and contributions for or against propositions differ very little.

The original proponents of the initiative and referendum sought to give the electorate the ability to govern directly by majority rule: this was to be true democracy as distinguished from representative democracy. Instead, the domination of these processes by large contributors

leaves other citizens with a stilled voice in the very domain of our electoral system set aside for accomplishing the popular will.[5] The finding, all too common in commentaries on the initiative and referendum, that direct legislation is "enormously expensive to produce and is largely a tool of interest groups," appears to have inspired measures like the Berkeley ordinance, which attempt a return to the primary goals of the initiative and referendum. (Crouch et al., Cal. Government and Politics (3d ed. 1964) p. 108.) When large contributors use the power of their purse to overcome the power of reason, they thwart the intended purpose of the initiative or referendum: instead of fostering participation by a greater segment of the electorate, the vision of direct democracy is transformed into a tool of narrow interests. (Nicholson, *Buckley v. Valeo: The .Constitutionality of the Federal Election Campaign Act Amendments of 1974*, 1977 Wis.L.Rev. 323, 330.)

The danger lies not only in the frustration of our declared policy of preserving the initiative and referendum system, but in the inevitable effect on the electoral process as a whole. The importance of this process to the conduct and future of our democratic form of government cannot be gainsaid. Indeed, "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." (*Reynolds* v. *Sims* (1964) 377 U.S. 533, 555 [12 L.Ed.2d 506, 523, 84 S.Ct. 1362].) "The electoral process is at the very heart of constitutional government; it is to a large degree the ultimate arena in the competitive struggle for ideas." (Rosenthal, *Campaign Financing and the Constitution* (1972) 9 Harv.J.Legis. 359.) And, as the United States Supreme Court said on a closely related matter, "what is involved here is the integrity of our electoral process, and, not less, the responsibility of the individual citizen for the successful functioning of that process. This case thus raises issues not less than basic to a democratic society." (*United States* v. *Auto. Workers* (1957) 352 U.S. 567, 570 [1 L.Ed.2d 563, 566-567, 77 S.Ct. 529].)

In *Buckley* the court recognized the potential for corruption of the electoral process in a regime of large contributions in candidate elections. (424 U.S. at pp. 26-27 [46 L.Ed.2d at p. 692].) Here, it is argued that the electoral process is similarly corrupted by such contributions

---

[5]Thus the Berkeley Election Reform Act begins with the declaration that "Local government should serve the needs and respond to the wishes of all citizens equally, without regard to their wealth...."

because voters lose confidence in our governmental system if they come to believe that only the power of money makes a difference. In another context we recognized the danger of such a loss of confidence: "One disturbing phenomenon of the current political scene of which we may take judicial notice is an apparent substantial increase in voter apathy. The erosion and decay caused by the acid of indifference, unconcern, and lack of participation, if prolonged, may pose a danger to the democratic institutions, far more subtle and invidious than any other." (*Johnson v. Hamilton* (1975) 15 Cal.3d 461, 471 [125 Cal.Rptr. 129, 541 P.2d 881].)

Commentators on our political scene have recognized the nexus between voter apathy and large campaign contributions: "The mass of citizens have tended to shun the opportunity to donate to campaign coffers and to participate in other forms of political activity because they felt their limited resources would be outmatched by a small group of rich and influential 'angels'.... [This feeling] has also inspired the emergence of a growing sense of estrangement or disaffection from public institutions and leaders." (Berg et al., Corruption in the American Political System (1976) 47-50.) The result of this phenomenom is decidedly negative: "By abandoning the field of battle, the average voter leaves the political wars to be fought by big contributors and powerful interests." (*Id.* at p. 51.)

Another political scientist reviewed the dramatic effect of large contributions on the results of ballot measure votes in Colorado and concluded, "This study did not find Colorado citizens apathetic, cynical, or ignorant towards the initiatives. The majority of people were interested in the issues and did have ideas on them. But on several proposals their ideas tended to reflect the latest polling techniques, campaign strategies and gimmicks of those with the most power and money. The corrosive impact of this unregulated, grossly unequal power perverted the democratic process in a manner for all to see, whether or not the final election results were to one's liking.... It seems clear that initiative campaigns can be subject to the same types of influence that exist in other types of electoral politics, although perhaps in different proportions. Because personality issues may be less important, and partisanship is less clear, money may be all the more crucial." (Shockley, The Initiative, Democracy and Money: The Case of Colorado, 1976, printed in Hearings Before the Subcom. on the Const. of Sen. Com. on Judiciary on S. J. Res. 67, 95th Cong., 1st Sess., at pp. 188-189 (1977).) A student of the California initiative process has also expressed his belief

that this form of corruption may be as injurious as a direct bribe of a public official. (Radabaugh, Tendencies of Cal. Direct Legislation (1961) *id.* at p. 279.)

The Berkeley ordinance, on the other hand, seeks to reverse the trend toward loss of confidence in our political system and apathy in elections by assuring the voters that their vote and their participation, whether in the form of money or services, are significant. We conclude that the interests served by the ordinance should be recognized as compelling. Next, we turn to an examination of the countervailing First Amendment rights asserted by CARC.

## B

CARC contends that any interest served by section 602 pales in comparison with the infringement of First Amendment rights caused by the ordinance. It further argues, relying on *Bellotti*, that the ordinance actually has a detrimental effect on the initiative process because it prevents the voters from receiving adequate information to enable them to cast an informed vote. We agree, of course, that direct participation of the people through the initiative or referendum "increases the need for '"the widest possible dissemination of information from diverse and antagonistic sources."' [Citation.]" (*Bellotti*, 435 U.S. at p. 790, fn. 29 [55 L.Ed.2d at p. 726]); but while the measure at issue in *Bellotti* completely silenced the voice of Massachusetts corporations, the ordinance here has no such purpose or effect.

To the contrary, the Berkeley ordinance allows to all the right to participate in a ballot measure campaign and to join with others in so doing. The statute at issue in *Bellotti* totally prohibited both corporate expenditures and contributions; the Berkeley ordinance places no limit on expenditures, and permits contributions from any source in amounts up to $250. Thus, an individual or business entity that believes its interests are benefitted or threatened by a proposed ballot measure remains free to *spend* money in unlimited amounts, by mass advertising or any other method, to inform the public of its reasons why the measure should be adopted or defeated. However, in order to maintain the initiative and referendum processes as a tool of direct democracy for the people, individuals or business entities are prohibited from *contributing* more than a modest sum to a committee formed to support or oppose the measure. In addition, of course, no restriction is placed on the right

of individuals or corporate members to volunteer their *services* in a ballot measure campaign.

CARC's assertion that its right to engage in effective political advocacy is affected by a contribution ceiling is answered by the decision in *Buckley.* The high court recognized the constitutional problems that would result if a contribution limit did prevent effective advocacy, but stated: "The overall effect of the Act's contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression, rather than to reduce the total amount of money potentially available to promote political expression." (424 U.S. at pp. 21-22 [46 L.Ed.2d at p. 689].) The court pointed out that only 5.1 percent of the funds raised by 1974 congressional candidates came in amounts greater than the $1,000 ceiling. (*Id.* at p. 21, fn. 23 [46 L.Ed.2d at p. 689].) Here, Berkeley stresses that only about 17 percent of CARC's funds were raised from persons or entities contributing in excess of the limitation. Further, CARC ended all fundraising almost a month before the election, and presumably could have raised more funds in legal amounts had it continued to solicit contributions.

We conclude that the Berkeley ordinance does not interfere with effective advocacy or dissemination of information by all sides to a ballot measure controversy, but instead is designed to preserve initiative and referendum elections for the salutary purpose for which they were created, and tends to prevent the corruption of the political process that otherwise results.

Similarly, the ordinance does not impermissibly limit associational rights guaranteed by the First Amendment. CARC argues that such rights are violated because those who desire to give more than $250 are required to spend it on their own. This argument too was answered in *Buckley*, when the court observed that contribution ceilings nevertheless leave the contributor "free to become a member of any political association and to assist personally in the association's efforts . . . ." (424 U.S. at p. 22 [46 L.Ed.2d at p. 689].) Thus under the Berkeley ordinance anyone who wishes to do so may join and work for any committee supporting or opposing a ballot measure. This is the heart of the freedom to associate; no case has held that the right extends so far as to entitle political contributors to dominate such committees and their campaigns by unconstrained financial pressure.

It could be contended that unlimited expenditures by individuals and corporations can be as sinister as unlimited contributions to committees, and that the activities of committees can be as essential to the political process as those of individuals and corporations. While as a broad proposition that viewpoint may be arguable, it is a value judgment. On such matters we yield to the legislative determination.

The contrary legislative determination here is not without a tenable rationale. Campaign committees are generally shrouded in anonymity, often adopting seductive names promising to save taxes, preserve resources, or prevent crime. While committees must ultimately identify their donors, the campaign propaganda and the identification are not simultaneous: inducements are disseminated and voter impressions are formed substantially before the sources of committee financing are revealed. On the other hand, when political views are expressed directly by individuals and corporations rather than indirectly or covertly through committees, the voters are immediately made aware of the interested parties and can evaluate their motivation.

### C

Finally, the ordinance cannot be sustained unless it is necessary to promote a compelling governmental interest and operates by means that are the least restrictive of First Amendment rights. We hold above that large contributions to a local ballot measure campaign threaten our electoral system and potentially pervert the purpose of initiative procedures; in light of this conclusion, restricting the size of such contributions "focuses precisely on the problem." (*Buckley*, 424 U.S. at p. 28 [46 L.Ed.2d at p. 693].) We reject, as the *Buckley* court did, the argument that mere disclosure of contributions is sufficient for this purpose. (*Id.* at pp. 27-28 [46 L.Ed.2d at p. 693].) As with the measure at issue in *Buckley*, the contribution limitation in section 602 does not interfere with other ways of engaging in political activity, but restricts the one means that represents a danger rather than an aid to the electoral process.

We also reject the argument that the ordinance is unduly restrictive because the $250 ceiling is too low. The major proportion of CARC's funds came in amounts under the ceiling; moreover, the few contributions that were larger were considerably above the ceiling, and hence

would not have been aided by a modest upward adjustment.[6] The court in *Buckley* refused to invalidate contribution ceilings on this ground absent proof that the difference was so great as to be a matter of kind and not of degree. (424 U.S. at p. 30 [46 L.Ed.2d at p. 694].) No such proof is presented here. Finally, we point out this is not a statewide initiative but merely a local campaign in a single municipality, and the amount of the ceiling must be viewed in that light.

We conclude that the Berkeley ordinance is necessary to the accomplishment of compelling governmental interests, and uses the least restrictive means to achieve those ends. It violates neither the First Amendment nor article I, section 2, of the California Constitution.

The judgment is reversed.

Bird, C. J., Tobriner, J., and Newman, J., concurred.

**RICHARDSON, J.**—I respectfully dissent. In my view, the Berkeley ordinance impermissibly suppresses rights of free expression of California citizens. It clearly violates First Amendment principles, both of freedom of speech and association, as repeatedly expressed by the United States Supreme Court. It also contravenes similar guarantees contained in article I, section 2, of the California Constitution.

Provisions of the ordinance have been litigated before. Its section prohibiting any person from making "any contribution to any candidate or committee" was struck down in *Pacific Gas & Electric Co.* v. *City of Berkeley* (1976) 60 Cal.App.3d 123 [131 Cal.Rptr. 350]. The provision before us prohibits any individual, corporation, or other entity from contributing more than $250 to any campaign in support of, or opposition to, any ballot measure. A citizens' committee organized itself to oppose a rent control ballot measure at the Berkeley general election of April 1977. The committee raised money from interested citizens and groups to assist its campaign, and the majority now authorizes the forfeiture into the Berkeley City Treasury of $18,600 of the committee's donated funds.

The ordinance impairs two constitutional rights of the donors and contributors to the committee. Each is fundamental. Each is constitu-

---

[6]The record shows that CARC received three contributions of $5,000, one of $2,000, and two of $1,000.

tionally protected. First, is the citizen's right of free speech and of unrestricted expression. The First Amendment prohibits Congress from "abridging the freedom of speech." A similar guarantee, expressed somewhat differently, appears in article I, section 2, of our state Constitution, and provides that "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

With specific application to the free speech limitations contained in the ordinance before us, it has been held by the highest authority that campaign restrictions "operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' [Citation.] Although First Amendment protections are not confined to 'the exposition of ideas,' [citation] 'there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs,...' [Citation.] This no more than reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' [citation]." (*Buckley* v. *Valeo* (1976) 424 U.S. 1, 14 [46 L.Ed.2d 659, 685, 96 S.Ct. 612].)

The second right, which is restricted by the Berkeley law, is that of free association. As we observed last year "contribution limitations restrict the contributor's freedom of association,..." (*Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 43 [157 Cal. Rptr. 855, 599 P.2d 46].) This associational right has also been repeatedly described by the United States Supreme Court as a "'basic constitutional freedom,' *Kusper* v. *Pontikes* [1973] 414 U.S., at 57, that is 'closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.'" (*Buckley* v. *Valeo, supra*, 424 U.S. 1, 25 [46 L.Ed.2d 659, 691]; *Shelton* v. *Tucker* (1960) 364 U.S. 479, 486 [5 L.Ed.2d 231, 236, 81 S.Ct. 247]; *Bates* v. *Little Rock* (1960) 361 U.S. 516, 522-523 [4 L.Ed.2d 480, 485, 80 S.Ct. 412].)

The reality of this limitation on a donor's associational rights is immediately disclosed when it is noted that the Berkeley ordinance

permits expenditures without limit to influence the results of the election by advertising or other means. John Q. Citizen himself may spend unlimited funds for or against the rent control measure. Yet, if the same citizen exercising a right to associate with others of like mind seeks to give to a committee which either supports or opposes the same ballot proposition, the *contribution* may not exceed $250. Although the majority approves this result, Justice Rouse speaking for a unanimous Court of Appeal was eminently correct in describing this consequence as "a supreme anomaly" because thereby "a contributor is entitled to less protection when he exercises his First Amendment rights of free speech *and association*, than if he exercised only his right to free speech." One fundamental right receives greater protection than two in combination. Such a result is wholly untenable and cannot be valid constitutional law. "If a person's independent speech cannot be restricted constitutionally, neither can his speech through association." (Note, *The Unconstitutionality of Limitations on Contributions to Political Committees in the 1976 Federal Election Campaign Act Amendments* (1977) 86 Yale L.J. 953, 967.)

When two such fundamental rights of a citizen, free speech and association, are conjoined, any attempted restriction "'is subject to the closest scrutiny.'" (*Buckley*, 424 U.S. at p. 25 [46 L.Ed.2d at p. 691].) We have said that any impairment may be supported only when "the restraints imposed are nonetheless justified as incidental to the promotion of a 'substantial' or 'compelling' governmental interest, unrelated to speech, and unattainable by means less intrusive upon First Amendment rights." (*Hardie* v. *Eu* (1976) 18 Cal.3d 371, 377 [134 Cal.Rptr. 201, 556 P.2d 301].) In so concluding we have but echoed similar expressions by the high court: *Buckley* v. *Valeo, supra,* 424 U.S. 1, 14, 21 [46 L.Ed.2d 659, 684-685, 689]; *N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415, 438 [9 L.Ed.2d 405, 83 S.Ct. 328].)

More recently, in a case in which the Supreme Court invalidated an outright ban on expenditures or contributions by corporations aimed at influencing the vote on ballot measures, the court emphasized that when restraints on First Amendment rights are at issue "'The state may prevail only upon showing a subordinating *interest which is compelling'* [citations], 'and the burden is on the government to show the existence of such an interest.' [Citation.] Even then, the State must employ means 'closely drawn to avoid unnecessary abridgment....' [Citations.]" (Italics added, *First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 786 [55 L.Ed.2d 707, 724, 98 S.Ct. 3126].)

What, then, is the compelling interest requiring imposition of a restraint so substantial on two rights so fundamental? The majority identifies it thus: "large contributions to a local ballot measure campaign threaten our electoral system and potentially pervert the purpose of initiative procedures;..." (*Ante*, p. 831.) My colleagues of the majority urge a theory that public confidence in the electoral processes is undermined by permitting unrestricted contributions in ballot measure elections. It is noteworthy that it is not the *fact* of a danger but the *potential* of a danger that alone generates the *compelling* interest found by the majority. It will readily be seen that this wholly untested political hypothesis is not based upon any record but rather upon the opinions and conclusions of "commentators on our political scene," "a political scientist," or a "student of the California initiative process." (*Ante*, p. 828.) Moreover, the "commentators" and "students" have hardly been unanimous in their support of contribution limitations to ballot measures. (For contrary views, see generally, Note, *supra*, 86 Yale L.J. 953; Ely, *The Supreme Court, 1977 Term* (1978) 92 Harv. L.Rev. 5, 163; Redish, *Campaign Spending Laws and the First Amendment* (1971) 46 N.Y.U. L.Rev. 900; Clagett & Bolton, *Buckley* v. *Valeo* (1976) 29 Vand.L.Rev. 1327.)

The majority's conclusion that there is such a "threat" to our electoral system thereby "potentially" inhibiting the initiative process may or may not be correct. There is no record before us and in this connection the procedural posture of the case should be noted. The trial court granted summary judgment in favor of the citizens' committee which attacked the ordinance. Assuming, only for purposes of analysis, that the trial court was improvident in the entry of its summary judgment invalidating the ordinance, it is manifestly unfair for the majority on the other hand to sustain the ordinance without affording the citizens' committee an opportunity to challenge or rebut the opinions and views of the "commentator," "political scientist," and "student" on which the majority wholly relies. The study of a Colorado ballot measure, or a 16-year-old analysis which concludes that the California initiative and referendum process is "largely a tool of interest groups" would make interesting background material for a political debate. Unquestioned and unverified, however, these opinions do not constitute the hard evidentiary support needed to demonstrate a state's present and *compelling interest* in the suppression of the multiple First Amendment rights of our California citizens. The existence of such a threat and its potential are wholly undocumented. Indeed the only empirical data that appear in the record are studies of spending on statewide initiative campaigns

in California during the period 1954-1974. The studies conducted by a Sacramento research organization, reveal that in 28 statewide contests the highest spenders won 14 times and lost 14 times. I must leave to the reader what that arithmetic proves.

The rationale for the ordinance's restrictions, viewed as sufficient by the majority, is the danger of "corruption" of the initiative process through the infusion of unlimited sums of money by "large contributors" (*ante*, p. 827) favoring or opposing a ballot measure. This, the majority argues, will destroy the electorate's "confidence in our political system." (*Ante*, p. 829.) In the absence, however, of some affirmative showing "by record or legislative finding" this precise reasoning, central to the majority opinion, was flatly rejected, as to corporate contributors, by the *Bellotti* court, *supra*, 435 U.S. 765, at pages 789-790 [55 L.Ed. 2d, p. 726], in these words: "[T]here has been no showing that the relative voice of corporations has been overwhelming or even significant in influencing referenda in Massachusetts or that there has been any threat to the confidence of the citizenry in government." Similarly, there has been "no showing" whatever that large contributors, corporate or otherwise, have thwarted or perverted the initiative in California, which at present appears to be alive and well and increasingly used.

The majority further concludes that candidate and ballot measure elections "differ very little" and that, as in candidate elections, large contributions have "equivalent potential to pervert the purpose of the initiative and more generally corrupt the electoral process." (*Ante*, p. 826.) But again, the Supreme Court summarily dismissed this reasoning, noting, "*Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections*, [citation] *simply is not present in a popular vote on a public issue.* To be sure, corporate advertising may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it: The Constitution 'protects expression which is eloquent no less than that which is unconvincing.' [Citation.]" (*Bellotti, supra*, 435 U.S. at p. 790 [55 L.Ed.2d at pp. 726-727].) (Italics added.)

The same result was reached July 11, 1980, by a unanimous Fifth Circuit in which it sustained a district court's invalidation of similar statutory limit on contributions to a committee supporting a referendum measure. The Court of Appeals noted: "When people elect a candidate, they choose someone to whom they can delegate their political decision-

making. The people's need to prevent large contributors from improperly influencing this representative decisionmaker is critical. In contrast, when people vote on a referendum proposal, they directly decide the pertinent political issue for themselves. Large contributions for publicity by one group or another do not influence the political decisionmakers —in this case, the voters themselves—except in a manner protected by the first amendment." (*Let's Help Florida* v. *McCrary* (5th Cir. 1980) 621 F.2d 195.) For identical views from the Second Circuit, see *Schwartz* v. *Romnes* (1974) 495 F.2d 844, 851-853, and from the Ninth Circuit see *C & C Plywood Corp.* v. *Hanson* (1978) 583 F.2d 421, 425.

Directly answering and rejecting the majority's assertion that, unless restricted, "the domination . . . by large contributors leaves other citizens with a stilled voice, . . ." (*ante*, pp. 826-827) the high tribunal emphasized, " . . . *the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment*, which was designed 'to secure "the widest possible dissemination of information from diverse and antagonistic sources,"' and '"to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."' *New York Times Co.* v. *Sullivan* [(1964) 376 U.S. 254] at 266, 269, quoting *Associated Press* v. *United States*, 326 U.S. 1, 20 (1945), and *Roth* v. *United States* [1957] 354 U.S., at 484. The First Amendment's protection against governmental abridgment of free expression cannot properly be made to depend on a person's financial ability to engage in public discussion. [Citation.]" (*Buckley* v. *Valeo, supra*, 424 U.S. 1, 48-49 [46 L.Ed.2d 659, 704-705], italics added.)

Thus, point by point, I find the majority's rationale wholly inconsistent with and opposed to the First Amendment free speech and associational pronouncements of the United States Supreme Court, which are binding upon us under federal supremacy principles.

Moreover, the majority does not attempt to answer Justice Rouse's perceptive analysis of the meaning of "corruption" within the initiative context: "The term 'corrupt' implies the existence or expectation of a political *quid pro quo*. In addition, the term 'corruption' subtly conveys the impression that there is a deviation from an objective standard. Such a belief can have no validity. In a democratic system, objective 'truth' is that which the majority subjectively chooses to adopt. Hence it is delusive to maintain that a declaration by the electorate can be 'cor-

rupt.' The price of free speech is that we must put up with opinions which we may deem to be the purest humbug, untainted by any trace of truth.... (*N.A.A.C.P. v. Button* [1963] 371 U.S. 415, 445.)"

Beyond this, however, there is inherent in the majority position an underlying theme that to me is disturbing, namely, that somehow the California electorate needs to be "protected" from free spending "special interests" which will mislead the voters at election time with slanted propaganda, confusing them into making decisions that are unwise for them. This whole approach is very dubious for several reasons.

I note that section 112 of the Berkeley ordinance requires that the city shall publish in Berkeley newspapers, and in such other newspapers as the Berkeley Fair Campaign Practices Commission considers appropriate, a list of all contributors of over $50 to all candidates or committees. These publications shall occur at least twice during the last seven days of the campaign. The sources of initiative financing thus are matters of public record freely available to the electorate before an issues election. (See *C & C Plywood Corp., supra*, 583 F.2d at p. 425.)

The majority, in my opinion, substantially underestimates the sophistication, intelligence and political maturity of the California electorate. It is a reasonable assumption that the average voter understands that the initiatives and referenda, statewide or local, are sponsored and supported by groups or individuals who may have "axes to grind" and who are beneficially interested in the result.

The increasing use of the initiative and referendum and the rising costs of elections, as noted by Justice Rouse, are hard facts of the present political scene. Doubtless $250 does not buy as much free speech today as it did in 1974 when the ordinance was adopted, suggesting the not altogether pleasing prospect that under the majority's rationale a citizen's most fundamental First Amendment rights may expand and contract with the Consumer Price Index.

Regardless of the foregoing, however, I wholly disagree with the premise underlying the majority's assumptions which betrays an overprotective "father knows best" syndrome. I find nothing in either Constitution, federal or state, or in law or policy which permits a city council to quantify or measure out the amount of information or misinformation which the electorate may receive in a ballot measure campaign. In my view, a city council has no authority to permit $250

worth of free speech and association and then, drawing the line, to confiscate for the city treasury all sums in excess thereof donated either by supporters or opponents who wish to be heard on an initiative measure.

The long arm of government does not belong in this arena where the direct voice of the people is heard through the initiative or referendum. Where the clash of contesting ideas, opinions and arguments in many forms culminates in the ultimate expression of the people's will, through an issues election, let the people be the sole judge. Let them separate for themselves the wheat of truth from the chaff of falsehood. They need no self-appointed protective guardian to measure for them the amount of public issue information, misinformation or argument which is to be available for their consideration. Justice Jackson put it very well in his concurring opinion in *Thomas* v. *Collins* (1945) 323 U.S. 516, 545 [89 L.Ed. 430, 448, 65 S.Ct. 315]: "The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind. . . . In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us."

The controlling principle is fundamental: "Government is forbidden to assume the task of ultimate judgment, lest the people lose their ability to govern themselves. See *Thornhill* v. *Alabama*, 310 U.S. 88, 95 (1940); Meiklejohn, The First Amendment is an Absolute, 1961 S. Ct. Rev. 245, 263. The First Amendment rejects the 'highly paternalistic' approach of statutes like § 8 which restrict *what* the people may hear. [Citations.]" (*Bellotti, supra,* 435 U.S. fn. 31, pp. 791-792 [55 L.Ed.2d p. 727], italics added.) In similar fashion, in my view, the First Amendment prohibits adoption of ordinances which restrict *how much* the people may hear on public issues. This is the clear import of the recent First Amendment expressions of the high court. In the words of one interpretive commentator: "The court [in *Bellotti*] properly deemed it safer to entrust the marketplace of ideas to private and diverse individuals and groups than to allow state controls over speakers and messages. The Court's approach is consistent with recent decisions invalidating paternalistic state restrictions on commercial speech. The public can be trusted to evaluate political and commercial messages in light of their sources before making political and consumer decisions." (Ely, *supra,* 92 Harv. L.Rev. at pp. 168-169.)

There can be no doubt that a rent control measure is a "governmental affair" of broad interest to landlords, tenants and to the public at

large. A free flow of information to an electorate which decides this issue is wholly salutary. Public comment and discussion, pro or con, is highly desirable and should be encouraged. Thus, the speech is protected.

Finding it impossible to square either the majority's rationale or its holding with numerous United States Supreme Court decisions, several of them very recent, which define in broad terms the reach of the First Amendment protections for American citizens, I conclude that the ordinance before us is constitutionally flawed.

Doubtless, the Berkeley City Council in adopting the contribution restrictions of the ordinance was well intentioned. Nonetheless, it was misadvised for it violated the First Amendment in trenching on two fundamental rights of our citizens without any demonstration of the requisite degree of compelling interest. The limitations of the ordinance cannot stand when considered in the light of this overriding pronouncement of the United States Supreme Court in *Bellotti, supra*, at pages 791-792 [55 L.Ed.2d at pages 727-728]: "[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. They may consider, in making their judgment, the source and credibility of the advocate. But if there be any danger that the people cannot evaluate the information and arguments advanced by appellants, it is a danger contemplated by the Framers of the First Amendment." [Fn. omitted.]

I would affirm the judgment.

Clark, J., and Manuel, J., concurred.