[S.F. No. 24659. Dec. 27, 1984.]

SAMUEL UNGER et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN
FRANCISCO, Respondent;
REPUBLICAN PARTY OF CALIFORNIA et al., Real Parties in Interest.

**COUNSEL**

Lynn S. Carman and George Beavin for Petitioners.

No appearance for Respondent.

John A. Slezak for Real Parties in Interest.

Arlo Hale Smith as Amicus Curiae on behalf of Real Parties in Interest.

**OPINION**

**MOSK, J.**—Under California law, a vacancy in the office of a justice of the Supreme Court is filled by appointment of the Governor. Thereafter, at a general election in which the appointee runs unopposed, the voter is asked

whether the Governor's appointment should be confirmed. (Cal. Const., art. VI, § 16.) Section 6 of article II (hereinafter section 6) provides, "Judicial, school, county, and city offices shall be nonpartisan." The issue in this proceeding is whether a political party and its governing body are prohibited by section 6 from endorsing or otherwise supporting a campaign not to confirm justices of the Supreme Court at a general election.

On March 9, 1982, petitioners, two registered voters,[1] filed a petition for a writ of mandate in the superior court alleging that the Republican Party, its state central and executive committees, and two individuals had endorsed the "nonconfirmation" of three justices of the Supreme Court in the November 1982 General Election, and that they planned to use the assets of the party to further this goal.[2] This conduct, according to the allegations, exceeded the powers of real parties in interest under section 6 and sections 9276 and 9440 of the Elections Code.[3] Petitioners sought to restrain real parties in interest from supporting the "nonconfirmation" campaign.

The trial court sustained real parties in interests' demurrer and entered an order of dismissal. Thereafter, petitioners, claiming that appeal from the trial court's order was an inadequate remedy because of the impending election, filed this petition for a writ of mandate seeking to vacate the order.

The election at which the confirmation of the justices was unsuccessfully opposed by real parties in interest has taken place, and the relief sought by petitioners is therefore no longer available. However, we address their contentions because the issues raised are of general public interest and will likely recur in future elections. (*Green* v. *Layton* (1975) 14 Cal.3d 922, 925 [123 Cal.Rptr. 97, 538 P.2d 225]; *Knoll* v. *Davidson* (1974) 12 Cal.3d 335, 344 [116 Cal.Rptr. 97, 525 P.2d 1273]; *Zeilenga* v. *Nelson* (1971) 4 Cal.3d 716, 719-720 [94 Cal.Rptr. 602, 484 P.2d 578]; *Board of Education* v. *Watson* (1966) 63 Cal.2d 829, 832 [48 Cal.Rptr. 481, 409 P.2d 481].)[4]

---

[1]Petitioner Unger is not affiliated with any political party; petitioner Blasdell is a registered Republican.

[2]Real party in interest Tirso del Junco is chairman of the Republican State Central Committee, and real party in interest William Campbell was the chairman and member of a study and campaign committee of the Republican Party for the nonconfirmation campaign.

[3]All statutory references will be to the Elections Code, unless otherwise noted.

Section 9276 provides that the Republican State Central Committee "shall conduct party campaigns for this party and in behalf of the candidates of this party. It shall appoint committees and appoint and employ campaign directors and perfect whatever campaign organizations it deems suitable or desirable and for the best interest of the party."

Section 9440 provides that a county central committee "shall have charge of the party campaign under general direction of the state central committee or of the executive committee selected by the state central committee."

[4]Since the issue of relief sought by petitioners is moot, we need not consider their claim, denied by real parties in interest, that real parties in interest violated section 9277 because their decision to support the campaign was made at a state central committee meeting which lacked a quorum.

■ As we have seen, section 6 does not refer to any specific conduct by a political party or its governing body;[5] it merely declares the general principle that judicial, school, county and city offices shall be nonpartisan. In deciding whether the conduct which petitioners seek to enjoin in the present proceeding violates this principle of nonpartisanship, we look to the legislative background and purpose of section 6, as well as to the historical role played by political parties in nonpartisan elections and in the conduct of party affairs. A consideration of these matters will lead us to the conclusion that section 6 does not prohibit parties from endorsing, supporting, or opposing candidates for nonpartisan office.

Early in the history of California, political parties were viewed as private associations, not subject to control by the Legislature in their selection of candidates for election. (*Britton* v. *Board of Commrs.* (1900) 129 Cal. 337, 340-341 [61 P. 1115]; *People* v. *Cavanaugh* (1896) 112 Cal. 674, 675-676 [44 P. 1057].) They were governed largely by custom and usage, and nominations for elective office were made by party conventions. (*Spelling* v. *Brown* (1898) 122 Cal. 277, 279 [55 P. 126]; *Hutchinson* v. *Brown* (1898) 122 Cal. 139, 192-193 [54 P. 738].) In 1907, in *Katz* v. *Fitzgerald,* 152 Cal. 433, 435 [93 P. 112], it was recognized that the state had the power to regulate political parties, and when the direct primary law was enacted early in the century the Legislature exercised this power by regulating both party conventions and the method by which parties nominated candidates. (Stats. 1909, Ex. Sess. 1907, ch. 405, §§ 2, 24, pp. 691, 706; Stats. 1911, ch. 398, §§ 2, 24, pp. 770, 788; Stats. 1913, ch. 690, §§ 2, 24, pp. 1381, 1405.) ■ Today, the code contains numerous provisions concerning the organization and obligations of parties and their governing bodies. (Div. 7, § 8000 et seq.) However, such entities are not agencies of the state for all purposes, and, as a number of observers have commented, their governing bodies remain free to act on behalf of the party without specific legislative authorization. (59 Ops.Cal.Atty.Gen. 60, 62 (1976); 23 Ops.Cal.Atty.Gen. 119, 120 (1954); Friedman, *Reflections Upon the Law of Political Parties* (1956) 44 Cal.L.Rev. 65, 71.)

■ Our focus, then, is not to decide whether political parties have legislative authority to support or oppose candidates for nonpartisan office, but whether there is any express restraint against such actions.

Of the various alternatives open to the Legislature in promoting the principles of nonpartisanship, it chose only to control the form of elections for

---

[5]The code allows only political parties receiving a certain percentage of the vote at a primary or general election to qualify to participate in a primary election. (§ 6430.) The term "political party" as used in this opinion refers only to a party so qualified.

nonpartisan office in various respects, and to impose a single restriction on the conduct of political parties. In the former category are provisions stating that declarations of candidacy and other nomination papers for nonpartisan office may not refer to party affiliation (§ 6401.5), the name of the party to which a nonpartisan candidate belongs may not appear on the ballot, a voter may cast his ballot for a candidate for such an office without regard to party affiliation (§§ 10200.5, 10214), and partisan and nonpartisan offices are listed in separate columns of the ballot (§ 10207). The only limitation on the conduct of political parties with respect to elections for nonpartisan office is that they may not nominate a candidate for such an office. Section 37 defines "nonpartisan office" as "an office for which no party may nominate a candidate"; conversely, section 36 defines a partisan office as one for which a party may nominate a candidate. Section 37 goes on to provide, in language almost identical to section 6, that "Judicial, school, county and municipal offices are nonpartisan offices." Since there is no other restriction on the participation of political parties in elections for nonpartisan office, the inference is clear that no additional limitation was intended.

Factors in addition to the absence of an express prohibition reinforce the conclusion that the Legislature did not intend to impose the restrictions asserted by petitioners. The Legislature has granted broad discretion to county and state central committees (the governing bodies of political parties) to act on behalf of the party. (E.g., §§ 9443, 9276, 9440, 9272.)[6] Obviously, the election of candidates whose views are perceived as being consistent with the principles espoused by the party would enhance the interests of the party. Moreover, it has been customary for the governing bodies of political parties to endorse or assist candidates in elections for nonpartisan office. (See *Unger* v. *Superior Court* (1980) 102 Cal.App.3d 681, 684, and fn. 4 at pp. 684-685 [162 Cal.Rptr. 611]; Lee, The Politics of Nonpartisanship (1960) at pp. 102-104; 59 Ops.Cal.Atty.Gen. 60, *supra,* at pp. 64-65.)[7] Surely, if the Legislature had intended to deny them such rights it has had ample opportunity to enact legislation to that end.

---

[6]Section 9443 provides that county central committees of the Republican Party "shall perform such other duties and services for this political party as seem to be for the benefit of the party." Section 9276, authorizes the state central committee to conduct party campaigns and to form whatever campaign organizations it "deems suitable or desirable and for the best interest of the party," and section 9440 provides that a county central committee shall have charge of the party campaign. Section 9272 authorizes the officers of the state central committee to exercise "the power usually exercised by such committees and the officers thereof insofar as may be consistent with this division."

[7]The study by Professor Lee does not specifically mention support of candidates for judicial office. It indicates, however, that party funds and the use of party precinct machinery were utilized in support of nonpartisan candidates, and that party organizations participated in local elections in 25 percent of the counties surveyed. (Tables 32 and 33 at p. 102.) According to declarations filed in *Unger* by the chairmen of the local central committees, their committees had endorsed and/or supported candidates for judicial and other nonpartisan office for many years.

Another indication that such a restriction was not intended is the passage in 1963 of section 11702, which prohibits governing bodies of political parties from endorsing, supporting, or opposing any candidate for nomination by the party for *partisan* office in the primary election.[8] The fact that there is no parallel limitation on endorsements for nonpartisan office raises a clear inference that the Legislature intended no such limitation.

Thus, we conclude that the Legislature has not prohibited political parties from continuing their practice of endorsing and supporting candidates for nonpartisan office. Unless section 6 expresses a contrary intent, real parties in interest must prevail in this proceeding. An analysis of the history of section 6 demonstrates that it was not designed to place any greater restrictions on the conduct of political parties than those which were in existence prior to its enactment, i.e., a prohibition against nomination of candidates for nonpartisan office.

The first mention of nonpartisan office in the Constitution appeared in 1926, when article II, section 2¾, was adopted. It provided that a candidate for judicial, school, county, township "or other nonpartisan office" was deemed elected if he received a majority of all the ballots cast for that office at the primary election. Then, as now, the Constitution did not define the term "nonpartisan office." However, for many years before the adoption of article II, section 2¾, the direct primary law contained provisions similar to the code requirements described above to promote the nonpartisan character of elections. Although there was no express prohibition against the nomination of candidates for nonpartisan office by political parties, the substance of these provisions (similar to the current provisions of the code regulating the form of nonpartisan elections) accomplished that result. (Stats. 1913, ch. 690, p. 1379.)[9] It must have been intended, therefore, that the undefined term "nonpartisan office" as used in article II, section 2¾, of the Constitution signified an office filled by an election nonpartisan in form, and for which a party could not nominate a candidate. Petitioners point to no evidence to the contrary.

---

[8]Section 11702 is a part of the Truth in Endorsements Law, designed to protect the public from deception in political campaigns. (§ 11701.) Section 11702 was recently held unconstitutional by a federal district court as denying political parties rights under the First Amendment. (*San Francisco County Democratic Central Committee* v. *Eu*, No. C-83-5599 MPH.)

[9]For example, various local offices were excepted from the partisan primary (§ 2); party designations could not appear on ballots or on nomination papers for judicial, school, county or township offices (§ 5, subd. 2; § 12, subd. 1), and a voter could vote for candidates for nonpartisan office regardless of party affiliation (§ 16). In 1939, a specific prohibition against party nomination of nonpartisan candidates was enacted as section 41 of the code. (Stats. 1939, ch. 26, § 1, p. 49.)

Article II, section 2¾, was deleted from the Constitution in 1972, and section 5 of article II, identical to section 6, was substituted in its place. The proceedings of the Constitution Revision Commission as well as the ballot pamphlet presented to the voters in 1972 demonstrate that section 2¾ was viewed as a guarantee that judicial and local offices were nonpartisan, and that no change in the meaning of the provision was intended by the change in the language, except that city offices were added to the list of nonpartisan offices, in recognition of existing practice.[10] Section 5 was renumbered section 6, without change in language, in 1976.

It is manifest from this analysis that section 6 was not intended to impose restraints on the conduct of political parties greater than those that existed before its enactment by the voters in 1972 as section 5. Since no prohibition against support of or opposition to nonpartisan candidates was in effect prior thereto, the conclusion follows that real parties in interest acted within their rights in taking a position on the confirmation of justices in the 1982 General Election.[11]

The only authority to the contrary is *Unger* v. *Superior Court, supra,* 102 Cal.App.3d 681 (hereinafter *Unger I*). There, the Marin County Democratic Central Committee endorsed and planned to make financial contributions to four candidates for election to the nonpartisan office of the governing board of the Marin Community College District at the November 6, 1979, election. Petitioner, a candidate for the board who was not endorsed by the committee,[12] sought to enjoin the committee's action, claiming that it violated section 6. The court, relying on a broad definition of the term "nonpartisan" in a dictionary, held that section 6 prohibited the committee from supporting or opposing candidates to the governing board of the district.

---

[10]Commissioner Spear, a member of the Constitution Revision Commission, moved to *retain* the constitutional requirement that judicial and local offices mentioned in section 2¾ be nonpartisan, and the motion was carried by a voice vote. (Minutes of Aug. 1, 1968, meeting of the art. II com., p. 3.) The commission's report states that section 2¾ is the only existing constitutional guarantee that judicial, school, and county offices are nonpartisan, and that the substance of the section should be *retained* and clarified. City offices were added to the list of nonpartisan offices in recognition of existing practice. (Proposed Revisions of Cal. Const. (1970) pt. 2, p. 19.) The ballot pamphlet for the 1972 election stated simply that "Judicial, school, county, and city offices would be continued as nonpartisan offices." (Proposed Amend. to Cal. Const., Gen. Elec. (Nov. 7, 1972) p. 18.)

[11]Petitioners appear to claim that even if a political party is allowed to endorse or oppose a candidate for nonpartisan office, it should be prohibited from engaging in other conduct during the campaign to vindicate its views. In view of our conclusion that neither section 6 nor any other provision of law was intended to restrain political parties from participating in the election campaign for nonpartisan office (aside from the prohibition in § 37), we can see no justification for such a limitation.

[12]Unger, one of the petitioners in the present proceeding was also the petitioner in *Unger I.*

It is evident from what we say above that we must disapprove this holding.[13] The opinion does not mention the legislative history of section 6, nor does it recognize that there is no express prohibition in section 6 or elsewhere in our statutes to prohibit the conduct in question. The court simply chose the broadest definition of "nonpartisan" among several offered in the dictionary upon which it relied.

We consider one final argument made by petitioners. They assert that section 6 prohibits the governing body of a political party from endorsing or supporting a candidate for office absent a prior "poll" of party members as to their preferences. We take this assertion to mean that a political party may not endorse a candidate before a primary election, since the only "poll" of party members of which we are aware is at the primary.

We cannot approve this contention. As we conclude above, the governing bodies of political parties may act on behalf of the party, except to the extent limited by law; there is no requirement that a "poll" be held before such a body may support or oppose a candidate for nonpartisan office.

Petitioners rely primarily on an opinion of the Attorney General to bolster their claim that a "poll" is required. (23 Ops.Cal.Atty.Gen. 119, *supra.*) But this opinion addresses a different problem. It declares that a county central committee may not lawfully endorse or support one of several competing candidates of the *same* party who oppose each other in a preprimary campaign. This prohibition is implied from statutes which the opinion interprets as designed to avoid interparty factionalism.[14] We do not see how such a conclusion, based on avoiding conflict among members of the same party, provides support for petitioners' assertion that political parties may

---

[13]Real parties in interest seek to distinguish *Unger I* on the ground that it dealt with an election contest between opposing candidates, whereas here even if the nonconfirmation campaign had been successful, the election would not have determined who would serve as the holder of the office, since any vacancy resulting from the unseating of a justice would be filled by appointment of the Governor. Thus, claim real parties in interest, unlike the situation in *Unger I,* the ultimate holder of the office would not be beholden to the party's interests. We have some doubts regarding the validity of this distinction in view of the broad grounds on which *Unger I* was decided. But we need not decide whether the distinction is valid since we disapprove of the holding of *Unger I* in any event.

[14]For example, the opinion relies on a provision of the code (now § 9688), which authorizes state central committees to conduct campaigns for party candidates as implying that the committee may not endorse one of several of the candidates who are members of the party before the primary election. If such endorsement were allowed, dissension within the party would result, which would inhibit the committee from carrying out its statutory function of conducting the party's campaign on behalf of its candidates. The opinion also cites a provision (now § 9443), which allows a county central committee to act for the "benefit" of the party; it reasons that the preprimary endorsement of a single candidate is not for the benefit of the party, but for an individual or group within the party. (23 Ops.Cal.Atty.Gen. 119, *supra,* at pp. 122-123.)

not support or oppose candidates for nonpartisan office. The opinion is, if anything, more favorable to the position of real parties in interest than to that of petitioners, for it recognizes the principle that the governing bodies of parties "possess the powers conferred upon them by party usage and of which the law has not deprived them." (*Id.* at p. 120.)

The prohibition implied in the cited opinion of the Attorney General against preprimary support of partisan candidates was later embodied in section 11702; and as noted above (*ante*, fn. 8), the section has been declared unconstitutional by a federal district court as a violation of the First Amendment rights of political parties. Two federal courts in Florida have reached a similar conclusion, holding unconstitutional statutes prohibiting political parties from endorsing candidates for partisan (*Abrams* v. *Reno* (S.D.Fla. 1978) 452 F.Supp. 1166, 1171-1172) and judicial (*Concerned Democrats of Florida* v. *Reno* (S.D.Fla. 1978) 458 F.Supp. 60, 64-65) office.[15]

In view of our determination that neither section 6 nor any other provision of law barred real parties in interest from supporting or opposing the confirmation of the justices of the Supreme Court, it is not necessary to consider whether such a ban would violate their constitutional rights.

Our conclusion in this case is reached without consideration of policy questions. We are not unmindful of the persuasive reasons why it is preferable for political parties to refrain from endorsing or opposing nonpartisan candidates. However, that is a matter for consideration by the Legislature; it, not the judiciary, is the proper body to impose regulations on the conduct of political parties.

The alternative writ heretofore issued is discharged as having served its purpose, and the peremptory writ is denied.

Files, J.,* and Janes, J.,† concurred.

**GRODIN, Acting C. J.,** Concurring.— ■■ ■■ I am sympathetic to the views expressed in Justice Sims' scholarly opinion. The prospect of

---

[15]The statute held unconstitutional in *Concerned Democrats* prohibited parties or partisan political organizations from supporting or assisting candidates for judicial office. Although the petitioner there was an unofficial political organization, the court made no distinction in its holding between the two types of entities. It concluded that there were less restrictive means by which the legislature could assure the neutrality of judges, including restrictions on the conduct of candidates for judicial office during the election campaign.

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Acting Chairperson of the Judicial Council.

†Retired Associate Justice of the Court of Appeal sitting under assignment by the Acting Chairperson of the Judicial Council.

political parties participating directly in elections for judicial office through endorsement is not appealing, and I agree that article II is amenable to an interpretation that would prohibit such conduct. Indeed, were it not for First Amendment considerations, I would be inclined to join in Justice Sims' dissent. It is a cardinal principle of construction, however, that a provision must "be construed, if such a construction is fairly possible, to avoid raising doubts of its constitutionality." (*St. Martin Lutheran Church* v. *South Dakota* (1981) 451 U.S. 772, 780 [68 L.Ed.2d 612, 619, 101 S.Ct. 2142].) Because I have very serious doubts whether article II, as interpreted by real parties in interest, could withstand scrutiny under the First Amendment, I concur in the majority's more narrow construction.

Under real parties in interest's interpretation, article II would flatly prohibit a qualified political party from expressing any views concerning a judicial candidate's qualifications, competence, or record. The tension between such an absolute prior restraint on pure political speech and traditional First Amendment principles is obvious and palpable.

There can be no doubt that such a prohibition strikes at the heart of the First Amendment. As the United States Supreme Court stated in *Buckley* v. *Valeo* (1976) 424 U.S. 1 [46 L.Ed.2d 659, 96 S.Ct. 612]: "Although First Amendment protections are not confined to the 'exposition of ideas,' 'there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, . . . of course includ[ing] discussions of candidates . . . .' This no more than reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.' In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Monitor Patriot Co.* v. *Roy,* 401 U.S. 265, 272 (1971), 'it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" (*Id.,* at pp. 14-15 [46 L.Ed.2d at p. 685], citations omitted.)

Nor can there be any doubt that the First Amendment protects political association, including association through political parties (*Buckley* v. *Valeo, supra,* 424 U.S. at p. 15 [46 L.Ed.2d at p. 685]; *Cousins* v. *Wigoda* (1975) 419 U.S. 477, 487 [42 L.Ed.2d 595, 603, 95 S.Ct. 541]; *Kusper* v. *Pontikes* (1973) 414 U.S. 51, 56-57 [38 L.Ed.2d 260, 266-267, 94 S.Ct. 303]), and that "[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." (*Sweezy* v. *New Hampshire* (1957) 354 U.S. 234, 250 [1 L.Ed.2d 1311, 1325, 77 S.Ct.

1203]; see also *Buckley* v. *Valeo, supra,* 424 U.S. at p. 22 [46 L.Ed.2d at p. 689].)

Because article II, if interpreted as real parties in interest urge, would absolutely prohibit the expression of any opinion by or through a political party concerning candidates for certain public offices, it could be upheld only if the government can demonstrate that the provision furthers a compelling state interest and is narrowly drawn to avoid unnecessary abridgment of First Amendment rights. (*First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 786 [55 L.Ed.2d 707, 724, 98 S.Ct. 1407]; *Buckley* v. *Valeo, supra,* 424 U.S. at p. 25 [46 L.Ed.2d at p. 691].)[1] No such demonstration exists on this record.

Real parties in interest contend that article II serves the compelling state interest of maintaining judicial integrity and impartiality. Unquestionably, this is an interest "of the highest importance." (*Bellotti, supra,* 435 U.S. at p. 789 [55 L.Ed.2d at p. 725].) But neither the government's burden, nor this court's responsibility, is met merely by invoking such worthy objectives as a "talismanic incantation to support any exercise of . . . power." (*United States* v. *Robel* (1967) 389 U.S. 258, 263 [19 L.Ed.2d 508, 514, 88 S.Ct. 419].) Rather, strict scrutiny under the First Amendment requires us to examine closely the precise means employed by the state to effectuate its interests. (*Buckley* v. *Valeo, supra,* 424 U.S. at p. 238 [46 L.Ed.2d at p. 811], conc. opn. of Burger, C. J.)

Two assumptions underlie real parties in interest's contention that the prohibition contained in article II is necessary to maintain judicial integrity and impartiality. First, real parties in interest argue that without such a prohibition judges will be beholden or appear to be beholden to political parties. In *Buckley* v. *Valeo, supra,* the government made a similar argument in attempting to defend a limitation on campaign expenditures on the grounds that it served the "governmental interest in preventing corruption and the appearance of corruption." (*Id.,* at p. 45 [46 L.Ed.2d at p. 702].) The court rejected this argument, holding that while the government's purported interest was sufficient to justify a limit on contributions made directly to a candidate, it was inadequate to justify a limit on expenditures made by an

---

[1]Of course, "[i]t is irrelevant that the voters rather than a legislative body enacted [article II], because the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." (*Citizens Against Rent Control* v. *Berkeley* (1981) 454 U.S. 290, 295 [70 L.Ed.2d 492, 498, 102 S.Ct. 434].)

individual or group on behalf of a particular candidate.[2] If the state's interest in preventing corruption or the appearance of corruption cannot justify a limit on independent campaign expenditures, surely it cannot justify an absolute prohibition on all forms of expression relating to a campaign.[3]

The second assumption underlying real parties in interest's contention that article II is necessary to protect judicial integrity and impartiality is that voters will be so influenced by political party endorsements that they will blindly follow the parties' recommendations, thereby, in Justice Sims' words, "reducing the selection of candidates to a litmus test of endorsement by a given qualified political party." (*Post,* p. 642.) This assumption, even if true,[4] cannot justify a prohibition on political party endorsements for "the

---

[2]Although several years after *Buckley* v. *Valeo* the court, in *FEC* v. *National Right to Work Committee* (1982) 459 U.S. 197 [74 L.Ed.2d 364, 103 S.Ct. 552], did uphold certain restrictions on campaign contributions and expenditures by corporations and labor organizations, that holding is not controlling in this case. At issue in *National Right to Work Committee* was the meaning and constitutionality of one subsection of section 441b of the Federal Election Campaign Act (2 U.S.C. § 441b). Section 441b prohibits corporations and labor unions from making direct campaign contributions or expenditures in federal elections but allows them to establish a separate fund for the purpose of making such contributions and expenditures. As the court noted in *National Right to Work Committee*: "The separate segregated fund may be completely controlled by the sponsoring corporation or union, whose officers may decide which political candidates contributions to the fund will be spent to assist. The 'fund must be separate from the sponsoring union [or corporation] only in the sense that there must be a strict segregation of its monies' from the corporation's other assets." (*Id.,* at p. 200, fn. 4 [74 L.Ed.2d at p. 371], citation omitted.) In contrast to the relatively uninhibiting limitations imposed by section 441b, article II, as interpreted by real parties in interest, would absolutely prohibit any and all advocacy by political parties concerning judicial candidates. In fact, under real parties in interest's interpretation, article II would appear to prohibit not only "public" endorsements but recommendations or other communications made by parties directly to their members only. In *United States* v. *C. I. O.* (1948) 335 U.S. 106 [12 L.Ed. 1849, 68 S.Ct. 1349], the Supreme Court refused to construe section 313 of the Corrupt Practices Act to prohibit corporations and unions from expressing their views on candidates directly to their members, stockholders and customers because, as so interpreted, "the gravest doubt would arise in our minds as to its constitutionality." (*Id.,* at p. 121 [92 L.Ed. at p. 1861], fn. omitted.)

[3]In *Concerned Democrats of Florida* v. *Reno* (S.D.Fla. 1978) 458 F.Supp. 60, the trial court granted a preliminary injunction against enforcement of a prohibition on political party endorsements of judicial candidates on the grounds that existing restrictions on judicial candidates and the nonpartisan ballot process (similar to those in California) were sufficient and less restrictive means of achieving the state's interest in "maintaining the integrity and impartiality of the state judiciary." (*Id.,* at p. 64.) While this holding is not controlling, it does highlight the government's burden to demonstrate that, notwithstanding the existing restrictions, there remains a threat to judicial integrity and impartiality sufficient to justify an absolute prohibition on advocacy by political parties.

[4]One would expect judicial elections to become a mere "litmus test" for party endorsement only if political parties had an overwhelming influence on the voters' choice in nonpartisan elections. As in *Bellotti, supra,* 435 U.S. 765 [55 L.Ed.2d 707], however, "there has been no showing that the relative voice of [political parties] has been overwhelming or even significant in influencing" nonpartisan elections. (*Id.,* at p. 789 [55 L.Ed.2d at p. 726].) Indeed, one might expect that in local elections, where most judicial campaigns take place, local "special interest" and civic groups would have a greater influence over the

concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment . . . ." (*Buckley* v. *Valeo, supra,* 424 U.S. at pp. 48-49 [46 L.Ed.2d at p. 704].) Nor may the state, consistent with the First Amendment, restrict the advocacy of some in order to prevent the people from acting "unwisely" in response either to the eloquence or stature of the advocate. (See, e.g., *Bellotti, supra,* 435 U.S. at pp. 791, fn. 31, 792 [55 L.Ed.2d at pp. 727, 728]; *Linmark Associates, Inc.* v. *Willingboro* (1977) 431 U.S. 85, 96-97 [52 L.Ed.2d 155, 164-165, 97 S.Ct. 1614]; *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 770 [48 L.Ed.2d 346, 363, 96 S.Ct. 1817].)[5]

The fundamental difficulty with real parties in interest's position is that essentially the same arguments concerning judicial integrity can be made with respect to endorsements by other groups—unofficial political parties or partisan organizations, as well as special interest groups—who would remain free to express their views and to vigorously support or oppose any candidate for judicial office.[6] The possibility that a judge will appear beholden to particular interests, and the possibility that the public will be unduly influenced by a particular endorsement, are both risks inherent in a system which calls upon judges to run for office. It does not appear, at least from this record, that partisan endorsements pose such a substantial and unique threat as to justify the limitations upon freedom of expression posed by the interpretation which real parties in interest advocate. Because I be-

---

electorate than would political parties. (See, e.g., Lee, The Politics of Nonpartisanship (1960) pp. 77, 79.)

[5]Real parties in interest further attempt to justify the absolute prohibition they read into article II on the grounds that qualified political parties are already heavily regulated by the state and receive certain benefits as a result of this regulation. The United States Supreme Court has rejected this very argument. (*Consolidated Edison Co.* v. *Public Serv. Comm'n* (1980) 447 U.S. 530, 534, fn. 1 [65 L.Ed.2d 319, 325, 100 S.Ct. 2326]; see also *Abrams* v. *Reno* (S.D.Fla. 1978) 452 F.Supp. 1166, 1170.)

[6]This distinction raises serious equal protection problems. Where First Amendment interests are abridged, the equal protection clause requires that any legislative discrimination among speakers be narrowly tailored to serve a compelling state interest. (*American Party of Texas* v. *White* (1974) 415 U.S. 767, 780 [39 L.Ed.2d 744, 759, 94 S.Ct. 1296]; *Police Department of Chicago* v. *Mosley* (1972) 408 U.S. 92, 99, 101 [33 L.Ed.2d 212, 218, 220, 92 S.Ct. 2286].) While First Amendment and equal protection analyses are, therefore, almost identical in some cases, analysis under the equal protection clause, by "[h]ighlighting the legislative classification serves to illumine the state's interest in burdening those of the plaintiff's class and the necessity of doing so in order to advance that interest." (*Morial* v. *Judiciary Com'n of State of L.A.* (5th Cir. 1977) 565 F.2d 295, 304.)

Under equal protection analysis, the relevant question in this case becomes: in what way does the threat posed by qualified political parties differ significantly enough from that posed by all other political and "special interest" groups to warrant such different treatment? Real parties in interest nowhere address this crucial question. Without some indication that political parties pose a significantly greater or different threat than do other groups, it would be difficult to find that the government has met its burden under the equal protection clause.

lieve it is "fairly possible" to construe article II in a manner that avoids these serious flaws, I concur.

**LUCAS, J.—**  ██ ██  I concur, albeit reluctantly, in the majority opinion. My agreement stems from my conclusion that Justice Mosk has correctly interpreted the scope of the existing restrictions imposed by the Legislature and the California Constitution. My reluctance flows from my concern about the effect of our ruling in light of important social and political policy considerations expressed by Justice Sims in his dissent. I think there is a strong state interest in preserving the nonpartisan nature of the offices involved and that this interest will be sorely tried if political parties engage in wholesale endorsement of and opposition to candidates for "judicial, school, county, and city offices . . . ." (Cal. Const., art. II, § 6.)

Because this interest is so important, I cannot join in Justice Grodin's approach. His conclusion that the First Amendment may well bar restrictions on political endorsements of candidates for nonpartisan office is premature. The Legislature may be able to fashion a permissible limitation on partisan involvement in nonpartisan campaigns after careful scrutiny of the various interests at stake. I do not think that at this stage we should sweepingly discourage such an attempt. The majority opinion, of course, does not take that path.

**SIMS, J.\*—**While I concur with the order of the court, I respectfully dissent from the conclusion voiced in the foregoing opinion.

The majority opinion asks us to look to the background and purpose of section 6 of article II of the state Constitution and the historical role played by the Legislature and by political parties in nonpartisan elections and in the conduct of party affairs. My consideration of these matters leads me to the conclusion that the people, in adopting the constitutional provision under consideration, intended a broader definition of nonpartisanship than that suggested in the opinion; and that a qualified statutory partisan political party, as distinguished from its members and any voluntary groups made up of all or any of its members, is prohibited by the Constitution from lending the authority of its name, or the name of its subordinate statutory groups, or its titular officers by their statutory party titles, to the support or opposition of candidates for judicial, school, county and city offices. In so concluding, I face the issue of whether the First Amendment to the United States Constitution precludes a state from so immunizing its election process from statutorily established partisan interest. I conclude that inasmuch as

---

\*Retired Associate Justice of the Court of Appeal sitting under assignment by the Acting Chairperson of the Judicial Council.

no individual, whether or not holding office as a member of the qualified statutory partisan political party, or no voluntary association of such individuals is restrained from advocating the support or nonsupport of such candidates, the state, in the pursuit of the laudable aim of freeing judicial offices from partisan consideration, has properly served a compelling interest by limiting the elections in which the statutorily created party may officially participate.

## I.

On November 7, 1972, the people of this state voted to incorporate the following language in the California Constitution. "Judicial, school, county and city offices shall be nonpartisan." (Cal. Const., art. II, § 5, renumbered § 6, June 8, 1976.) In *Unger* v. *Superior Court* (1980) 102 Cal.App.3d 681 [162 Cal.Rptr. 611] (*Unger I*) (hg. by Supreme Ct. den. May 22, 1980; cert. den. Jan. 26, 1981, 441 U.S. 1131 [67 L.Ed.2d 118, 101 S.Ct. 952])[1] the petitioner sought to enjoin the Marin County Democratic Central Committee from endorsing and granting financial support to four candidates for election to the nonpartisan Marin Community College Board at the November 6, 1979, election. In determining that such actions should be prohibited as violating the provisions of section 6, the opinion defines nonpartisan as follows: " 'not affiliated with or committed to the support of a particular political party: politically independent . . . viewing matters or policies without party bias . . . held or organized with all party designations or emblems absent from the ballot . . . composed, appointed or elected without regard to political party affiliations of members . . . .' (Webster's New Internat. Dict. (3d ed. 1965)." (102 Cal.App.3d at p. 685.) Similarly in *State* v. *District Court* (1949) 122 Mont. 464 [206 P.2d 166] the court noted, "According to Webster's New International Dictionary: A *non-partisan* is a person 'appointed or elected without regard to political affiliations; not controlled by parties or party spirit or interests.' " (*Id.* at p. 476 [206 P.2d at p. 172].)

The majority opinion dismisses the common sense conclusion of *Unger I* as the result of reliance on a broad definition of the term "nonpartisan" in a dictionary. It disapproves *Unger I* because it does not mention the legis-

---

[1] *Unger I*, which is now disapproved in the majority opinion (*ante*, p. 618), is an interesting precedent. On October 31, 1979, four members of the Supreme Court, as then constituted, granted a hearing following denial of relief by the trial court and the Court of Appeal, and retransferred the case back to the Court of Appeal with directions to issue an alternative writ on the petitioner's petition for a writ of mandate. (Supreme Ct. minutes Oct. 31, 1979; 102 Cal.App.3d at p. 684.) Subsequently after the case was determined in favor of petitioner, a petition for hearing by the respondents was denied over the dissent of the author of the majority opinion in this case. (Supreme Ct. minutes May 22, 1980; 102 Cal.App.3d at p. 688.)

lative history of section 6 and because it fails to recognize that there is no express prohibition in section 6 or anywhere in our statutes to prohibit the conduct in question. (*Ante,* p. 619.) It concludes that the legislative background and purpose of section 6, as well as the historical role played by political parties in nonpartisan elections and in the conduct of party affairs leads to the conclusion that section 6 does not prevent statutorily qualified parties from endorsing, supporting or opposing candidates for nonpartisan office. (*Id.* at p. 615.) The opinion concludes from the historical background that the focus should not be to decide whether statutory political parties have legislative authority to support or oppose candidates for nonpartisan office, but whether there is an express restraint against such actions. It then finds that the only limitations imposed by the Legislature or by the Constitution are that such an organization may not nominate a candidate for such office and that the election shall be nonpartisan in form.[2] Strictly speaking an election nonpartisan in form is one in which no party label appears on the ballot, and candidates are nominated by a simple petition process. It is obvious, however, that if political parties are given the license offered by the proposed opinion, and only the form but not the substance of a nonpartisan election is guaranteed, there well may be a breakdown in the political philosophy underlying the use of such a ballot.

### A

Before demonstrating that prior legislation impliedly prohibited such activities, and that such activities cannot be justified on the grounds of improper practice in the past, I examine the purpose of section 6, and the intent of the voters in adopting the constitutional provisions. The plain meaning of the section is clear as laid out in *Unger I.* Unless a voter had prescience of the Attorney General's opinion rendered in January 1976 (59 Ops.Cal.Atty.Gen. 60), that voter in 1972 would not know or be concerned with the fact that the Legislature had failed to expressly curb a qualified partisan political party's authority to interfere in a nonpartisan election. The voter presumably would know that for almost six decades the power to nominate partisan candidates through primary election had been delegated to the registered voters of each party along with the election of party functionaries to support the election of those nominees and to conduct other partisan party affairs. The voter would be surprised to learn that when he

---

[2]This means that the election papers do not refer to a party affiliation (Elec. Code, § 6401.5); the name of the candidate's party shall not appear on the ballot and voters may vote for any candidate without regard to the voter's party affiliation (*Id.,* §§ 10200.5, 10214); and nonpartisan candidates are listed in separate columns on the ballot (Elec. Code, § 10207). Parenthetically we note that since 1966 judges of the Supreme Court and judges of Courts of Appeal may only be nominated by the incumbent's declarations of candidacy or by the Governor. (Cal. Const., art. VI, § 16, subd. (d).) The limited construction of the proposed opinion renders section 6 redundant for those offices.

voted to make judicial, school, county and city offices nonpartisan he only intended that a party could not nominate candidates for that office, and that he contemporaneously was permitting it free rein to endorse and use its resources to support or oppose such a candidate.

The majority opinion recognizes that there are "persuasive reasons why it is preferable for political parties to refrain from endorsing or opposing nonpartisan candidates." (*Ante,* p. 620.)[3] Nonpartisanship in judicial elections serves several purposes. It permits the voter to focus on the intelligence, experience and integrity of the candidates rather than their political affiliations. It frees the candidates from obligation to a political organization that may later seek to exact favors for former or future support. It permits the nomination and reelection of qualified candidates without the necessity of securing a nomination in a partisan election.[4]

These purposes, aimed at preserving the independence of the judiciary as one of the three constitutional branches of government, will be subverted by authorizing and encouraging the statutorily constituted political parties to grant or withhold endorsement of candidates for judicial office as a matter of practice. Such organizations are specially created to advance the partisan aims of party members through the selection and election of candidates for legislative and executive offices who will expound those aims in office. (See *Moore* v. *Panish* (1982) 32 Cal.3d 535, 542 [186 Cal.Rptr. 475, 652 P.2d 32].) It is obvious that the official interjection of such organizations in judicial elections will result in demands for similar subservience from candidates seeking formal endorsement for their election to the bench, and in tainting the election to the constitutionally designated nonpartisan office with issues unrelated to the administration of justice. Certainly the electorate had these evils in mind in adopting section 6.

---

[3]In *Moore* v. *Panish* (1982) 32 Cal.3d 535 [186 Cal.Rptr. 475, 652 P.2d 32] where the majority of the court permitted a candidate for nonpartisan office also to be a candidate for a partisan county central committee, the author of the majority opinion in this case, in dissenting, stated, "Conceivably it is possible for a person to serve on a local nonpartisan board and simultaneously conduct partisan campaigns as a party committeeman. But I suggest the inevitable injection of party politics into a nonpartisan office is likely to create administrative and substantive problems." (32 Cal.3d at p. 551.)

[4]It would be naive to fail to recognize that a vast majority of judicial positions are first filled by an appointment by a partisan elected official. I am also aware that such legal matters as "law and order" and "civil rights" sometimes become partisan political issues. Nevertheless, I believe that in selecting nonpartisanship, the people have expressed a philosophy that, if applied, should produce greater independence and integrity of the judiciary, than a system in which candidates may race from the filing office to seek a partisan endorsement by a statutory party organization.

The writer can recall his shock in learning in 1964 at the Institute of Judicial Administration Seminar for Appellate Court Judges that a judge of a court of general jurisdiction in one state where judges were elected on a partisan ticket was expected to contribute almost a year's salary to his party for the privilege of being its nominee.

Under the 1913 Direct Primary Law a candidate for a judicial, school, county or township office who received a majority of the votes cast at the primary election would be the only candidate for such office at the ensuing general election (Stats. 1913, ch. 690, § 23, p. 1404). Other constitutional provisions had been held to exempt judicial offices from any interpretation of this provision that would permit the election of a judge at a primary election. (See *Miller* v. *Childs* (1915) 28 Cal.App. 478, 486-489 [152 P. 972] and *French* v. *Jordan* (1946) 28 Cal.2d 765, 768-769 [172 P.2d 46].) As a result section 2¾ of article II of the Constitution was proposed and adopted in 1926 to provide as follows: "Any candidate for judicial, school, county, township or *other nonpartisan office* who at a primary election shall receive votes on a majority of all the ballots cast for candidates for the office for which such candidates seek nomination, shall be elected to such office . . . ." (As adopted Nov. 2, 1926, and repealed Nov. 7, 1972; italics added.)

The majority opinion adopts the reasoning of the Attorney General in his opinion (59 Ops.Cal.Atty.Gen. 60), disapproved in *Unger I* (102 Cal.App.3d 681, 688), which concluded "Prior to that time, there was no statute prohibiting party endorsements of any type. There is no reason to suppose that the adoption of article II, section 2¾ was intended to impose such a prohibition." (59 Ops.Cal.Atty. 60, 63.) This begs the question. The constitutional amendment did not intend to define nonpartisan office other than by its common meaning. The statutes as they developed clearly distinguished between partisan and nonpartisan offices and did not permit a construction other than that the official organizations created by the Direct Primary Law had no authority to participate formally or informally in the elections for the designated offices. (See subpart B below.)

There is no reason to believe that Commissioner Spear or the electorate thought that "nonpartisan" had the limited meaning attributed to it by the Attorney General and the majority opinion. As we have seen section 2¾ was at best recognition of the existing statutory provisions that provided for nonpartisan elections. It only prescribed the manner of determining such elections. It did not expressly curb the Legislature's power to designate the offices that would be partisan or nonpartisan. The 1972 provisions were the first to give constitutional sanction to a guaranty of nonpartisanship. The material referred to in the majority opinion in no way indicated that the term should be limited to other than its common meaning. (See maj. opn. *ante,* pp. 617-618 and fn. 10.)

Section 26 of article I of the California Constitution states: "The provisions of this Constitution are mandatory and prohibitory, unless by express

words they are declared to be otherwise."[5] This means that the provisions of section 6 of article II are self-executing. (*State Board of Education* v. *Levit* (1959) 52 Cal.2d 441, 460-461 [342 P.2d 8]; *French* v. *Jordan, supra,* 28 Cal.2d 765, 767 & 770; *Unger I, supra,* 102 Cal.App.3d 681, 685; *Flood* v. *Riggs* (1978) 80 Cal.App.3d 138, 154 [145 Cal.Rptr. 573].) I reiterate what was quoted in the *Levit* case and applied in *Unger I:* "This section . . . not only commands that its [the Constitution's] provisions shall be obeyed, but that that disobedience of them is prohibited. Under the stress of this rule, it is the duty of this court to give effect to every clause and word of the constitution, and to take care that it shall not be frittered away by subtle or refined or ingenious speculation. The people used plain language in their organic law to express their intent in language which cannot be misunderstood, and we must hold that they meant what they said." (*Oakland Paving Co.* v. *Hilton* (1886) 69 Cal. 479, 512 [11 P. 3].)

## B

In turning to the history of the development of government intervention and regulation of political parties we find that in 1866 the Legislature provided an optional primary election which any voluntary political association or party might use for electing delegates or candidates. (Stats. 1865-1866, ch. 359, §§ 1-7, p. 438; see Friedman, *Reflections Upon the Law of Political Parties* (1956) 44 Cal.L.Rev. 65, 66.) In *People* v. *Cavanaugh* (1896) 112 Cal. 674 [44 P. 1057], upon which the majority opinion relies, the court upheld the dismissal of an indictment for violation of the purity of elections act (Stats. 1893, ch. 16, p. 12) because the act did not apply to such elections. The opinion states: "For, as we have seen, political parties are a law unto themselves as to the conduct of primary elections." (112 Cal. at p. 676.) It is true that prior to the amendment of the state Constitution in 1900, nominations were made by party conventions and the validity of the certificates of nomination were determined by custom and usage. (See *Spelling* v. *Brown* (1898) 122 Cal. 277, 279 [55 P. 126]; *Hutchinson* v. *Brown* (1898) 122 Cal. 189, 193 [54 P. 738].) In the latter case the court observed, "Delegates to political conventions are no doubt trustees in a large sense of the word, but they discharge a trust with which the courts do not meddle. They obey or disobey instructions as they see fit, and the only remedy for their disobedience is the censure of the people expressed at the polls." (122 Cal. at p. 192.) The same opinion, however, did observe: "[A]ccording to universal party usage in California, the central or executive committee of a party has no function after one election is over, except to

---

[5]This language appeared in section 22 of article I of the Constitution of 1879. It was repealed and readopted as section 28 on November 5, 1974; and it was renumbered as section 26, June 8, 1978.

preserve the organization and take the necessary preliminary steps for the assembling of the next convention." (*Id.*, at p. 193.)

The Legislature made two attempts to impose a mandatory primary system in the interests of promoting purity of elections and supporting the exercise of free suffrage. The 1897 act (Stats. 1897, ch. 106, p. 115) was held unconstitutional on numerous technical grounds in *Spier* v. *Baker* (1898) 120 Cal. 370 [52 P. 659]. The court moreover expressed great misgivings concerning the state's right to regulate political parties. The opinion states, "We understand this law is the first of its kind in the United States. Its mandatory features present one of the greatest and most important innovations upon past legislation in this country bearing upon primary elections. Under the mandates of this act all political parties and associations must come under its wing or be destroyed. They must all bow down before it as the price of their existence. These things are only done by giant strides in state legislation, and the power of the state legislature to thus enact with reference to political parties presents grave and interesting questions." (*Id.*, at p. 380.)

In 1899 (Stats. 1899, ch. 46, p. 47) the Legislature by amendments to the Political Code sought again to provide for the mandatory election of delegates to conventions of political parties through a primary election. Again the statute was held unconstitutional. (*Britton* v. *Board of Commrs.* (1900) 129 Cal. 337 [61 P. 1115].) The plurality opinion observed that the law was an express limitation upon the powers political parties had theretofore exercised in adopting their own modes for selection of their representatives. (129 Cal. at p. 341.) Without determining that such elasticity was a right or a privilege, it found the statute was discriminatory in only granting participation to parties that had received 3 percent of the vote at the preceding election (*id.*, at pp. 341-344); and that in its nature, because it permitted cross-voting, it could disrupt and misrepresent a political party. (*Id.*, at pp. 344-347.)

On November 6, 1900, the people adopted a constitutional amendment empowering the Legislature to provide for a direct primary.[6] The constitutionality of statutes enacted after the amendment was upheld in a series of

---

[6]Section 2½ of article II as adopted in 1900 was amended and broadened in 1908. In 1962 it was amended and changed to section 2.5 and on November 7, 1972, it was repealed when its provisions were substantially incorporated in section 4 of article II. Section 4 was amended in 1974, and, as transferred to section 5 in 1976, the provisions now read: "The Legislature shall provide for primary elections for partisan offices, including an open presidential primary whereby the candidates on the ballot are those found by the Secretary of State to be recognized candidates throughout the nation or throughout California for the office of President of the United States, and those whose names are placed on the ballot by petition, but excluding any candidate who has withdrawn by filing an affidavit of noncandidacy."

cases. (*Rebstock* v. *Superior Court* (1905) 146 Cal. 308 [80 P. 65]; *Schostag* v. *Cator* (1907) 151 Cal. 600 [91 P. 502]; and *Katz* v. *Fitzgerald* (1907) 152 Cal. 433 [93 P. 112].) In *Rebstock* and *Schostag* the court upheld the right of the Legislature to prescribe tests of the right to vote at primary elections. In the latter case the court observed: "The evils to be remedied were the corrupt practices by which, in the absence of proper public control, primary elections were made to defeat the will of the *bona fide* members of political parties." (151 Cal. at p. 605.)

In *Katz* it was contended, among other grounds, that the system destroyed the right of self-preservation of political parties, and impaired the right of citizens to assemble together and to instruct their representatives. The unanimous court, after echoing the sentiment quoted from *Schostag,* added that the state had a general interest in guarding the purity of primary elections since they had become an essential feature of our system of choosing public officers; and that each political party had a special interest in reserving to its members control of its own affairs. It found both needs met. (152 Cal. at p. 434.) Significantly, the *Katz* opinion recites: "To the objection that it makes a public body of that which is, in its essence, a private association of citizens to accomplish a public purpose, it is sufficient to say that the conception that a political party is merely a private association of citizens, a conception which in the past found wide acceptance, has, under the development of modern political parties, been very generally abandoned, and, where not abandoned, the conception itself has been destroyed, as in this state by force of the constitution and the statutory laws enacted under it. By virtue of the constitutional provision the state has seen fit to declare that political parties shall be as to their mode of holding conventions and nominating candidates for public office, regarded as public bodies whose methods are to be controlled by the state." (*Id.,* at p. 435; see also *Christian Nationalist Party* v. *Jordan* (1957) 49 Cal.2d 448, 452-453 [318 P.2d 473, 70 A.L.R.2d 1153]; *Communist Party* v. *Peek* (1942) 20 Cal.2d 536, 544-545 [127 P.2d 889]; *Heney* v. *Jordan* (1918) 179 Cal. 24, 27-28 [175 P. 402]; *Socialist Party* v. *Uhl* (1909) 155 Cal. 776, 785-787 [103 P. 181]; *Cal. Democratic Council* v. *Arnebergh* (1965) 233 Cal.App.2d 425, 429 [43 Cal.Rptr. 531] petn. for hg. den., app. dism. for want of substantial question 382 U.S. 202 [15 L.Ed.2d 269, 86 S.Ct. 395]; cf. *Jones* v. *McCollister* (1958) 159 Cal.App.2d 708, 711-712 [324 P.2d 639].)

I conclude, with a learned student of the subject, that following the establishment of the direct primary system, the following situation prevailed: "In statutory contemplation California party organs have been left with one major role—to campaign for the general election success of the party nominees selected by the voters at the primary. This role, according to statutory the-

ory, they perform under direction of the state and county central committees." (Friedman, *op. cit. supra,* 44 Cal.L.Rev. at p. 69.)

With this background I examine the steps taken to render judicial elections nonpartisan. As of 1909 (Stats. 1909, ch. 405, p. 691) the provisions did not exclude any elected officers other than candidates at special elections to fill vacancies, officers of certain municipalities and districts, and of specified school districts. (*Id.,* § 2, pp. 691-692, and see forms of ballot, p. 701.) In 1911 (Stats. 1911, ch. 398, p. 769; Stats. 1911, Ex. Sess., ch. 17, p. 66) the new primary election law expressly provided for nonpartisan nominating petitions for candidates for judicial office and school office and defined those terms. It was expressly provided, "In the case of a candidate for nomination to a judicial office or a school office, no affidavit shall be made that the candidate intends to affiliate with any party or to vote for a majority or any of the candidates of any party at any election." (Stats. 1911, ch. 398, § 5, subd. 4, p. 774; Stats. 1911, Ex. Sess., ch. 17, § 3, subd. 4, p. 71.) The statute provided that the group of names of candidates for nomination to any judicial office or school office should be identical for each such office on the primary election ballot of each political party. Nevertheless, the ballot did not distinguish between partisan and nonpartisan offices. At the election a candidate for judicial office or school office who received a majority of the votes for a single office would qualify as the only candidate of those running for the general election, but he might be opposed by petition of one not a candidate at the primary.

In 1913 a new statute (Stats. 1913, ch. 690, p. 1379) added county and township officers to the nonpartisan statutes. (*Id.,* § 1, subds. 6, 7, 8, p. 1380.) With regard to the nonpartisan offices, the statute provided: "In the case of a nomination paper for any candidate for a judicial office, school office, county office, or township office, the provisions of this subdivision shall apply, except that no such nomination paper nor any section thereof shall contain the name of any political party, of any signer thereto, nor shall the candidate be referred to as a candidate for the nomination of any party." (*Id.,* § 5, subd. 3, p. 1388.) By this law it was first provided that the candidates for the "judicial," "school" and "county and township" offices should be segregated from the partisan offices on the ballot. (*Id.,* § 12, subds. 5, 6, pp. 1396-1397, and see form of ballot, § 12, subd. 10, p. 1399.)

From the foregoing provisions and statutory history viewed in the light of the actual duties imposed on the elected party representatives, I can only conclude that the Legislature intended that judicial, school, county and township office elections should be divorced from partisan interference. Nowhere can I find it implied or understood that the official party representa-

tives were to cloak the candidates for nonpartisan offices in their fold as had been the case before the 1911 and 1913 exclusions.

We are told that the general powers conferred by the Legislature (see Elec. Code, § 9443, and note §§ 8942, 9742, 9852, 9954) give a discretion which embraces the right of the statutory governing bodies of political parties to endorse or assist candidates in elections for nonpartisan office. An overview of the statutory provisions reflects a primary election in which the partisan electorate selects its committeemen and nominees, who then, in turn with others, constitute the organization to press for election of candidates in the general election. I find no intent that these groups should at a later date in the twilight of their incumbency bestir themselves to get judicial candidates to file petitions so they can endorse the candidate in a subsequent primary election. Insofar as sections 8942, 9443, 9742 and 9852 authorize a qualified party to "perform such other duties and services for this political party as seem to be for the benefit of the party," such authorization should be limited to acts not prohibited by the Constitution.

The majority opinion also rests on custom and usage; and points out that the Legislature has failed to curb the practice, as it did in the case of pre-primary endorsements for partisan office. (Elec. Code, § 11702, and see 23 Ops.Cal.Atty.Gen. 119 (1954); 19 Ops.Cal.Atty.Gen. 12 (1952).)[7] In *Unger I,* 102 Cal.App.3d 681, the court did note that there had been occasions when endorsements and support had been given to candidates for nonpartisan offices. (102 Cal.App.3d at p. 684, fn. 4 at pp. 684-685.)

In Lee, The Politics of Nonpartisanship (1960), the tables referred to reflect that political organizations had been active in city or school elections in 9 percent or 8 of the 192 cities reporting and 25 percent or 11 of the 44 counties reporting. The Attorney General's opinion (59 Ops.Cal.Atty.Gen. 60, 64-65) also indicates similar partisan interference into nonpartisan elections. I am not impressed by these inroads into the philosophy and policy of a nonpartisan election, and the attempt to pin a limited meaning on the state constitutional provision. Should we say that the Fourteenth Amendment authorized separate but equal treatment in schools and public accom-

---

[7]I have noted the opinion of the federal district court referred to in the majority opinion (*ante,* at p. 617, fn. 8). I welcome the federal judge's abstention on the issue presented in this case as an opportunity to point out the statutory functions of the qualified parties in this state, and to reconcile the provisions of the United States and state Constitutions. For the reasons expressed by Deputy Attorney General (later Associate Justice of the Court of Appeal) Leonard M. Friedman in Opinion No. 54-29 (23 Ops.Cal.Atty.Gen. 119 (1954)) I believe the district judge erred in not finding a compelling state interest for the adoption of Elections Code section 11702 and in failing to distinguish between the right of freedom of speech of the qualified party and that of the individual members of the party and any voluntary association of such members.

modations and facilities because such were customarily furnished? I prefer to believe that the people, in adopting the provisions now embraced in section 6 of article II, looked at the system which disassociated the candidates for partisan office and their respective parties from candidates for judicial, school, county and city offices, and to the dictionary. In so doing they intended, as held in *Unger I,* that the candidates for such offices should be elected without regard to their political affiliation, and that the matter of choice should be viewed without official party bias. (102 Cal.App.3d at p. 685.)

The fact that the Legislature recognized the evils of official preprimary endorsement of partisan candidates and failed to similarly specifically restrict endorsement of nonpartisan candidates is not relevant. The subject of partisan candidates was one which the qualified parties were authorized to manage and control, and it was proper to correct the failure to follow the statutory system. On the other hand, any common sense interpretation of nonpartisan would indicate that the offices so designated should be free of influence of the statutory recognized parties. That there was no demand for legislative prohibition could not legalize what the law never contemplated.

"Legislative inaction can in no manner qualify constitutional provisions capable of self-execution whose language adequately sets forth the rule through which the duty imposed may be enforced." (*Unger I, supra,* 102 Cal.App.3d at p. 687 citing *Flood* v. *Riggs* (1978) 80 Cal.App.3d 138, 155 [145 Cal.Rptr. 573].)

I conclude that the statutorily recognized party may not officially endorse or expend funds for opposing or supporting a candidate for judicial office. That a referendum on a justice of the Supreme Court or the Court of Appeal is an election for judicial office cannot be questioned. Section 16 of article VI of the Constitution expressly refers to such an election under the title of "Election of judges" and expressly provides for a declaration of candidacy or nomination by the Governor of the person to stand for election.

## II.

Real parties in interest and amicus curiae contend if, as we assert, section 6 of article II of the state Constitution prohibits a qualified political party from officially endorsing or opposing a candidate in a nonpartisan judicial election, it violates the constitutional guarantees of freedom of speech and freedom of association, and denies them equal protection of the laws.

## A

The principles upon which they rely in respect to freedom of speech and association have been collated in the per curiam opinion in *Buckley* v. *Valeo*

(1976) 424 U.S. 1 [46 L.Ed.2d 659, 96 S.Ct. 612] as follows: "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' [Citations.] Although First Amendment protections are not confined to 'the exposition of ideas,' [citations] 'there is practically universal agreement that a major purpose of th[e] Amendment was to protect the free discussion of governmental affairs, . . . of course includ[ing] discussions of candidates . . . .' *Mills* v. *Alabama*, 384 U.S. 214, 218 (1966). This no more than reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 270 (1964). In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Monitor Patriot Co.* v. *Roy*, 401 U.S. 265, 272 [28 L.Ed.2d 35, 91 S.Ct. 621] (1971), 'it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.'

"The First Amendment protects political association as well as political expression. The constitutional right of association explicated in *NAACP* v. *Alabama*, 357 U.S. 449, 460 (1958), stemmed from the Court's recognition that '[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.' Subsequent decisions have made clear that the First and Fourteenth Amendments guarantee ' "freedom to associate with others for the common advancement of political beliefs and ideas," ' a freedom that encompasses ' "[t]he right to associate with the political party of one's choice." ' *Kusper* v. *Pontikes*, 414 U.S. 51, 56, 57, (1973), quoted in *Cousins* v. *Wigoda*, 419 U.S. 477, 487 (1975)." (424 U.S. at pp. 14 & 15 [46 L.Ed.2d at p. 685]. See, in addition to the cited cases included in the foregoing quotation, *Citizens Against Rent Control* v. *Berkeley* (1981) 454 U.S. 290, 295-296 [70 L.Ed.2d 492, 498-499, 102 S.Ct. 434] [revg. *Citizens' Against Rent Control* v. *City of Berkeley* (1980) 27 Cal.3d 819 (167 Cal.Rptr. 84, 614 P.2d 742)], *Consolidated Edison Co.* v. *Public Serv. Comm'n* (1980) 447 U.S. 530, 533-535 [65 L.Ed.2d 319, 325-326, 100 S.Ct. 2326]) and *First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 776-777 [55 L.Ed.2d 707, 717-718, 98 S.Ct. 1407].)

The interpretation we give to section 6 of article II must survive the exacting scrutiny necessitated by a state-imposed restriction of speech.

Where as here, a prohibition is against speech itself, and the speech is intimately related to the process of governing, the state may prevail only upon showing a compelling subordinate interest, and that it has employed a means closely drawn to avail unnecessary abridgement. (*First National Bank of Boston* v. *Bellotti, supra,* 435 U.S. 765, 786 [55 L.Ed.2d 707, 724]. See also, *Citizens Against Rent Control* v. *Berkeley, supra,* 454 U.S. 290, 298-299 [70 L.Ed.2d 492, 500-501]; *Consolidated Edison Co.* v. *Public Service Comm'n., supra,* 447 U.S. 530, 540 [65 L.Ed.2d 319, 329]; and *Buckley* v. *Valeo, supra,* 424 U.S. 1, 25 [46 L.Ed.2d 659, 691].)

Real party Republican Party has conceded that the maintenance of the integrity and impartiality of the state judiciary is a compelling state interest.[8] It contends that the censorship of the official party's simple advocacy of the removal of selected justices is not the least intrusive measure of achieving judicial impartiality and is therefore unconstitutional. As outlined above, the people of this state have mandated that judicial and other specified offices shall be nonpartisan. We have concluded that therefore the recognized statutory parties should be denied the right to participate as party partisans in their election. The record reflects, as stated in the majority opinion (*ante,* p. 614) that the real parties in interest, an officially recognized party and its responsible officers, intended to endorse the nonconfirmation of three justices of the Supreme Court in the November 1982 election, and planned to use the assets of the party to further that goal. The people have spoken and indicated that nonpartisan election of judges is necessary to secure their independence integrity and impartiality. To permit the acts complained of would permit a party to seek out a candidate to file an independent petition (the equivalent of a nomination) and then grant endorsement and support, similar to that furnished candidates for partisan office. We should not countenance a return to a system of partisan selection of judges which the people sought to avoid.

Real parties rely on *Concerned Democrats of Florida* v. *Reno* (S.D.Fla. 1978) 458 F.Supp. 60. There a Florida statute provided, "No political party or partisan political organization shall endorse, support or assist any candidate in his campaign for election to judicial office" (*id.* p. 61, fn. 1). The plaintiffs' were not, as here, the official state or local party committee, but were an organization formed and chartered by the executive committee of the state party and they are referred to in the opinion as "private citizens who wish to express their political preferences" (*id.* p. 65; cf. *Jones* v.

---

[8]The petition for hearing before this court states: "In summary, the Republican Party concedes that the maintenance of the integrity and impartiality of the state judiciary is a compelling state interest. The Party has no intention of disturbing the integrity and impartiality of the state judiciary and respectfully submits that its mere advocacy of the recall or nonconfirmation of selected justices will not do so."

*McCollister, supra,* 159 Cal.App.2d 708, 710). The group wanted to interview and publish its recommendations about judicial candidates. The court, as do real parties in interest in this case, recognized the state's compelling interest. It stated, "The court agrees that maintaining the integrity and impartiality of the state judiciary is a compelling state interest. There can be no question that the state has a vital interest in assuring that its judges are free from direct political pressure; that they can render decisions independent of political ramifications; and that they can discharge their duties free from the pressure, sometimes subtle and sometimes otherwise, that can be applied by political groups." (*Id.* at p. 64.)

The district court nevertheless concluded that the state could not control private citizens who wished to make their choices known, and that the statute in question was not closely drawn or the least intrusive method of achieving its objective because other statutes proscribing political activity by candidates for judicial office, and prescribing a separate nonpartisan ballot for judicial elections adequately treated the situation. (*Id.* at p. 65.)

The court in permitting the promotion of the exchange of political ideas for the benefit of the public expressed some reservations. The opinion states, "This factor is troublesome because there is an obvious interest to both the public and the Legislature in having judicial candidates free of the appearance of impropriety. An appearance of partisanship will hardly foster public confidence in the courts. However, the court feels constrained under cases discussed in conclusion number 4, *supra.*" (*Id.* at p. 65.) The cases referred to are those on which real parties in interest rely in this case and they are distinguished below. We point out here, however, that our interpretation of the California Constitution does not purport to infringe on the right of private citizens who wish to express their preferences in a nonpartisan election either alone or in association with others. It merely concludes that to avoid the troublesome appearance of party partisanship and possible impropriety, the party organization created to provide for the selection and support of a party's partisan candidates may not officially participate in the nonpartisan election.

In *Buckley* v. *Valeo, supra,* the court, in upholding the $1,000 limitation on individual contributions to a candidate stated, "To the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined. Although the scope of such pernicious practices can never be reliably ascertained, the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem is not an illusory one. [¶] Of almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the appearance of corruption stemming from public

awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." (424 U.S. at pp. 26-27 [46 L.Ed.2d at p. 692]; fn. omitted.) So here there is a compelling interest to prevent both actual, and the appearance of, impropriety. That interest has been expressed in our state law since 1911 and 1913.

The right of association is stressed in those cases which recognize the primacy of rules of a national party over a state regulation in determining the qualification of its delegates. (*Democratic Party of U. S.* v. *Wisconsin* (1981) 450 U.S. 107, 121-122 [67 L.Ed.2d 82, 94-95, 101 S.Ct. 1010]; and *Cousins* v. *Wigoda* (1975) 419 U.S. 477, 487-488 [42 L.Ed.2d 595, 603-604, 95 S.Ct. 541].) It also has served to protect the right to change party affiliation against arbitrary restrictions. (*Kusper* v. *Pontikes* (1973) 414 U.S. 51, 56-57 [38 L.Ed.2d 260, 266-267, 94 S.Ct. 303].) It has been asserted to uphold the right of those associating to voice their civil rights. (*N A. A. C. P.* v. *Button* (1963) 371 U.S. 415, 430-431 [9 L.Ed.2d 405, 416-417, 83 S.Ct. 328]; *N. A. A. C. P.* v. *Alabama* (1958) 357 U.S. 449, 460-461 [2 L.Ed.2d 1488, 1498-1499, 78 S.Ct. 1163].) It is recognized as a right to be free from unwarranted investigative processes. (*Sweezy* v. *New Hampshire* (1957) 354 U.S. 234, 250-251 [1 L.Ed.2d 1311, 1324-1325, 77 S.Ct. 1203].) In this case there is no burden on associating with the qualified parties for recognized partisan purposes. Nor is there any burden on those who would associate for endorsing, opposing or supporting any candidate in a nonpartisan election. We merely contend that insofar as an official party or organization is concerned it cannot get officially involved in the nonpartisan election.

Cases dealing with freedom of the press are not determinative of the issue here. (Cf. *Miami Herald Publishing Co.* v. *Tornillo* (1974) 418 U.S. 241, 251 [41 L.Ed.2d 730, 737, 94 S.Ct. 2831]; and *Mills* v. *Alabama* (1966) 384 U.S. 214, 218-219 [16 L.Ed.2d 484, 487-488, 86 S.Ct. 1434]; see also *Monitor Patriot Co.* v. *Roy* (1971) 401 U.S. 265, 275-276 [28 L.Ed.2d 35, 42-43, 91 S.Ct. 621] and *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 269-271 [11 L.Ed.2d 686, 700-701, 84 S.Ct. 710, 95 A.L.R.2d 1412].)

Whatever may be an official party's function as an organ of views with respect to candidates for partisan office and general issues of government, it is not created or authorized for the purpose of endorsing, opposing and tangibly supporting its views on nonpartisan candidates so as to thereby defeat and undermine the status of the election for nonpartisan offices.

On its face *First National Bank of Boston* v. *Bellotti, supra,* may be interpreted as protecting the unqualified freedom of speech of any corpo-

ration or association from regulation. There the court found no compelling state interest in prohibiting the corporations from making contributions or expenditures for the purpose of influencing the vote on any question submitted to the voters other than one materially affecting any of the property business or assets of the corporation. (435 U.S. at p. 795 [55 L.Ed.2d at p. 729].) The court recognized, as we do here, that preserving the integrity of the electoral process, preventing corruption, and preserving the individual citizens' confidence in government were factors of the highest importance. (*Id.* at pp. 788-789 [55 L.Ed.2d at pp. 725-726].) The court was careful to point out that the importance of governmental interest in preventing the corruption of elected representatives though the creation of political debts was not before it. It stated "The case before us presents no comparable problem, and our consideration of a corporation's right to speak on issues of general public interest implies no comparable right in the quite different context of participation in a political campaign for election to public office." (*Id.* at p. 788, fn. 26 [55 L.Ed.2d at p. 725]. See also, *Citizens Against Rent Control* v. *Berkeley, supra,* 454 U.S. 290, 297-298 [70 L.Ed.2d 492, 499-500].)

Since here the issue is the injection of partisan issues into the election of candidates for nonpartisan office we find *Bellotti* is neither controlling nor persuasive.

Governmental regulation of speech based on subject matter has been approved in narrow circumstances. In *Greer* v. *Spock* (1976) 424 U.S. 828 [47 L.Ed.2d 505, 96 S.Ct. 1211] the court held that the federal government could prohibit partisan political speech on a military base even though civilian speakers had been allowed to lecture on other subjects.[9] In *Lehman* v. *City of Shaker Heights* (1974) 418 U.S. 298 [41 L.Ed.2d 770, 94 S.Ct. 2714] the court concluded that a city transit system that rented space in its vehicles for commercial advertising did not have to accept political advertising.[10]

---

[9]The rationale is stated as follows: "What the record shows, therefore, is a considered Fort Dix policy, objectively and evenhandedly applied, of keeping official military activities there wholly free of entanglement with partisan political campaigns of any kind. Under such a policy members of the Armed Forces stationed at Fort Dix are wholly free as individuals to attend political rallies, out of uniform and off base. But the military as such is insulated from both the reality and the appearance of acting as a handmaiden for partisan political causes or candidates.

"Such a policy is wholly consistent with the American constitutional tradition of a politically neutral military establishment under civilian control. It is a policy that has been reflected in numerous laws and military regulations throughout our history. And it is a policy that the military authorities at Fort Dix were constitutionally free to pursue." (424 U.S. at p. 839 [47 L.Ed.2d at p. 515]; fn. omitted.)

[10]The plurality opinion concludes. "No First Amendment forum is here to be found. The city consciously has limited access to its transit system advertising space in order to mini-

In *Consolidated Edison Co.* v. *Public Serv. Comm'n.*, *supra,* the court struck down a regulation that prohibited the inclusion in monthly electric bills of inserts discussing controversial issues of public policy. (447 U.S. 530, 544 [65 L.Ed.2d 319, 332].) In distinguishing the cases last referred to the court stated, "*Greer* and *Lehman* properly are viewed as narrow exceptions to the general prohibition against subject-matter distinctions. In both cases, the Court was asked to decide whether a public facility was open to all speakers. The plurality of *Lehman* and the Court in *Greer* concluded that partisan political speech would disrupt the operation of governmental facilities even though other forms of speech posed no such danger." (*Id.* at p. 539 [65 L.Ed.2d at p. 329], fn. omitted.) This case does not involve access to government property, but we feel that the People's constitutionally expressed desire that certain offices and the elections of candidates to those offices should be nonpartisan is entitled to freedom from disruption by endorsement or opposition and tangible support from entities expressly recognized for partisan purposes.

In similar vein we turn to *CSC* v. *Letter Carriers* (1973) 413 U.S. 548 [37 L.Ed.2d 796, 93 S.Ct. 2880]. There the court upheld the constitutionality of the Hatch Act which prohibited active participation in political management or political campaign by civil service employees.[11] The aims of the Hatch Act are similar to the reasons that induced the people to mandate that their judicial officers be nonpartisan. Judges are expected to administer justice without bias or favoritism for or against any political party or group or the members thereof and to serve the impartial execution of the laws. It is not enough that they are prohibited from running on partisan tickets. In order to avoid the appearance of partisanship there is a compelling interest that the qualified political parties refrain from taking official action in the

mize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience. These are reasonable legislative objectives advanced by the city in a proprietary capacity. In these circumstances, there is no First or Fourteenth Amendment violation." (418 U.S. at p. 304 [41 L.Ed.2d at p. 778].)

[11]There the court stated: "It seems fundamental in the first place that employees in the Executive Branch of the Government, or those working for any of its agencies, should administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party. They are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group or the members thereof. A major thesis of the Hatch Act is that to serve this great end of Government—the impartial execution of the laws—it is essential that federal employees, for example, not take formal positions in political parties, not undertake to play substantial roles in partisan political campaigns, and not run for office on partisan political tickets. Forbidding activities like these will reduce the hazards to fair and effective government. [Citation omitted.] [¶] There is another consideration in this judgment: it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent." (413 U.S. pp. 564-565 [37 L.Ed.2d pp. 808-809].)

election of judicial candidates. Since all concerned may separately or in association present their views, the infringement solely by prohibition of use of the official party label will not leave the public uninformed as to the merit of candidates.

### B

We are told that our construction of section 6 deprives the qualified parties of equal protection of the laws because nonqualified parties and other associations of varying lines of political nature are left free to endorse, oppose and tangibly support their views with respect to election for nonpartisan office. In *California Medical Assn.* v. *FEC* (1981) 453 U.S. 182 [69 L.Ed.2d 567, 101 S.Ct. 2712], in respose to a similar contention, the opinion recites, "The differing restrictions placed on individuals and unincorporated associations, on the one hand, and on unions and corporations, on the other, reflect a judgment by Congress that these entities have differing structures and purposes, and that they therefore may require different forms of regulation in order to protect the integrity of the electoral process." (453 U.S. at p. 201 [69 L.Ed.2d at p. 583].) So here we find that since those who remain unregulated are those who cannot extend the imprimatur of a state-recognized political entity—the evil to be avoided—there is no unreasonable classification.

### III.

In *Bridges* v. *California* (1941) 314 U.S. 252 [86 L.Ed. 192, 62 S.Ct. 190, 159 A.L.R. 1346] (revg. *Bridges* v. *California* (1939) 14 Cal.2d 464 [94 P.2d 983] and *Times Mirror Co.* v. *Superior Court* (1940) 15 Cal.2d 99 [98 P.2d 1029]) the court observed, "The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect." (*Id.* at pp. 270-271 [86 L.Ed. at p. 207]; fn. omitted.)

There is no attempt here to throttle criticism of the judiciary. In fact the prohibition of partisan endorsement merely clears the air for free expression on the quality of the administration of justice, rather than reducing the selection of candidates to a litmus test of endorsement by a given qualified political party.

The question is now moot and the alternative writ has served its purpose. It should therefore be discharged and the peremptory writ should be denied.

Potter, J.,* concurred.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Acting Chairperson of the Judicial Council.